## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROSS DETTMERING, FRANCIS MANGUBAT, and all other similarly situated individuals,<br><br>     Plaintiffs,<br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>     Defendants, | Case No.: 22-cv-01482-JLH-SRF |
| MICHAEL EICHLER, and all other similarly situated individuals,<br><br>     Plaintiffs,<br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>     Defendants, | Case No.: 22-1574-CFC-SR |

# EXHIBIT A

**Exhibit A: VBit Legal Opinion Letter**

This exhibit is a legal memorandum prepared in 2020 by outside
cryptocurrency counsel for VBit Technologies Corp., analyzing whether VBit's mining and
hosting business model constituted a security or required money transmitter licensing under
federal or state law.

This memorandum was prepared before Defendant Sean Tu was hired by VBit in August
2020. Mr. Tu was not involved in obtaining this memorandum, did not review it at the time it was
prepared, and did not obtain a copy until late 2022. Its existence is relevant to show that VBit's
leadership sought legal compliance and to negate any inference that Mr. Tu knowingly joined a
fraudulent enterprise.

PRIVILEGED AND CONFIDENTIAL

 10128

**New York Office**
Zachary J. Kelman
1732 First Avenue
New York, NY

+1 (917) 285-5060
zachary@kelman.law

**Taipei Office**
Daniel J. Kelman
No. 6 Songde Rd, 3/F
Xinyi, Taipei, Taiwan
+852 6996 4573
daniel@kelman.law

**BY EMAIL**
To: VBit Technologies
Danh Vo
d.vo@vbittech.com

December 4, 2020

**This memorandum was prepared solely for our client, "vBit Technologies," and only our client may rely on its contents. Any other persons interested in the subject matter of this memorandum must obtain their own legal advice.**

**RE: vBit Securities Memorandum**

## I.        vBit's Businesses

Based on our understanding of the vBit business model, there are three separate companies, each playing a separate and distinct role. First, there is the mining rig retail company. This arm of vBit manufactures and sells bitcoin mining rigs through its website to customers throughout the globe. We will refer to this arm as "vBit Retail."

Second, vBit offers what we will refer to as a hosting service, where purchasers of mining rigs can elect to have vBit host and manage their rigs in exchange for a monthly or annual fee. The hosting customers determine which mining pool they will join and can switch their mining pool seventy two72 hours notice. Throughout this memorandum we will refer to this area of the business as "vBit Hosting."

Third, vBit offers a wallet service. All bitcoin mined by the users are transferred to their vBit wallet, which then allows the users to control their bitcoin and transfer them as they see fit. vBit does not charge any fees in connection with their wallet service. This arm of the business will be referred to as "vBit Wallet."

PRIVILEGED AND CONFIDENTIAL

In addition to the current businesses operated by the vBit family, vBit is also considering opening a virtual currency exchange where users can buy and sell virtual currencies. Based on our discussions, vBit's client base tends to be mostly located in the Philippines, Australia, Canada and New Zealand and those would likely be its first markets. Further, vBit does not intend to offer leverage trading nor any derivative or other exotic products such as derivatives or synthetic swaps. For the purposes of this memorandum, the potential new exchange will be referred to as "vBit Exchange."

***As stated throughout, we are operating under several assumptions based on our discussions with vBit and its representatives. If any of our stated assumptions are incorrect, it may have an impact on the analysis provided.***

## II.    Purpose of Memorandum

Our firm was retained to prepare this memorandum to address the issues listed below. That is the limitation of our analysis. Should additional information be required, or desired, please let us know as soon as possible.

1) whether the sale of mining rigs and the use of a hosting contract together rise to the level of an investment contract under Federal and State law requiring registration as a security;

2) whether vBit's mobile wallet is a money transmitter or money services business under state and federal regulation and requires registration as such; and

3) the statutory and regulatory issues associated with the establishment of a new exchange platform

## III.    Security Analysis

### A.    Introduction

As discussed above, as part of its business model, vBit operates an entity that builds and sells mining rigs used for the mining of bitcoin. In addition, vBit also offers customers who have purchased mining rigs the option of taking delivery of the rig and operating it themselves, or using a separate vBit entity to host the mining rig at vBit's server farms in Canada. In the past, multi-step transactions like that described above have been considered investment contracts and thus require registration as securities.

The purchase and sale of securities in the United States is regulated by the United States Securities and Exchange Commission ("SEC"). Following the passage of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), there was significant litigation regarding what constitutes an "investment contract." This determination was considerable, as investment contracts are considered securities under the both acts.

Securities must be registered as such with the SEC. Companies issuing securities are required to disclose significant information regarding the company's properties, business purpose, company's management, financial statements, and other information as well. However, not everything that

PRIVILEGED AND CONFIDENTIAL

qualifies as a security requires registration. There are exemptions to registration based on the marketing of the investment and the number of investors.

### B. Exemptions (Rule 506)

Rule 506 is a "safe harbor," meaning that an offering of securities that complies with the requirements of Rule 506 will not be considered a public offering of a security within the meaning of Section 4(2) of the Securities Act and registration will not be required.

Rule 506 offers two exemptions to registration under the Securities Act.  First, Rule 506(b) exempts companies from registration if:

- the company does not use general solicitation or advertising to market the securities;

- The company sells its securities to no more than 35 unaccredited investors. However, all unaccredited investors must be considered "sophisticated investors," meaning that they have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment;

- companies must give unaccredited investors disclosure documents that are generally the same as those required by Regulation A or registered offerings, including financial statements, which in some cases may need to be certified or audited by an accountant. Any information made available to accredited investors must also be made available to unaccredited investors. It is important that the disclosure documents do not contain any false or misleading statements and must not omit any information that would make previous disclosures misleading; and

- the company must make itself available to answer questions by prospective investors.

Second, Rule 506(c) allows companies to broadly solicit and generally advertise the offering and still be deemed exempt if:

- the investors in the offering are all accredited investors; and

- the company takes reasonable steps to verify that the investors are accredited investors, which could include reviewing documentation, such as W-2s, tax returns, bank and brokerage statements, credit reports and the like

Securities sold pursuant to a Rule 506 exemption are "restricted" securities and cannot be sold for at least six months (better to use 12 months) without those securities being registered prior to resale.

PRIVILEGED AND CONFIDENTIAL

While companies that comply with Rule 506 do not have to register, they must file what is known as a Form D with the SEC after the sale of the first securities/units. Form D is a notice that includes the names and addresses of the company's promoters, executives, directors, and some details about the offering.

The most important issue to avoid regulatory entanglement is for an entity to be selective as to whom the offer is presented. An entity that finds its own investors without the use of an intermediary or general advertising will most likely maintain its non-public offering status. While intermediaries can be used to sell the investment, they should be limited in number and limited in their ability to solicit investors.

Based on our discussions, vBit currently has over 4,000 customers. We are operating under the assumption that the vast majority, specifically more than 35 of these individuals, are unaccredited investors. As such, neither of the exemptions under Rule 506 would be available to vBit if the rig sales and hosting agreements are considered an investment contract. However, as will be discussed in further depth below, we do not believe the transactions at issue qualify as investment contracts, and are thus, not securities.

### C.  SEC v. Howey

#### i.  Background

In 1946, the Supreme Court of the United States ("SCOTUS") took the case of *SEC v. Howey*. The defendants in *Howey* were two Florida-based entities offering real estate contracts for tracts of lands in a citrus grove. At the time of purchase, Buyers of the land were offered the opportunity to lease the purchased land back to the defendants, who would then take care of the land and market and sell the fruit. Most of the buyers were not farmers and chose to enter into this agreement and lease the land back to the defendants.

In ruling that the leaseback contracts were in fact investment contracts, SCOTUS established what has since been referred to as the *Howey Test*. Specifically, the test is designed to determine if a particular transaction, or series of transactions, is an investment contract. Some 74 years later, the *Howey Test* remains the test used by federal courts.

It is important to note that the purchasers in *Howey* who worked their own tract of land, or hired someone else to manage it, were not considered investment contracts. As a result, vBit's sale of mining rigs to individuals who take actual delivery of their machines, would certainly not be considered an investment contract or a security.

#### ii.  The Test

The Court in *Howey* determined "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Since the decision in *Howey*, courts applying the test have broken it down into its four component parts; 1) investment of money; 2) in a common enterprise; 3) with the expectation of profits; and 4) solely from the efforts of others. The test is conjunctive, and each element must be present for an investment contract to be found.

PRIVILEGED AND CONFIDENTIAL

There has been substantial litigation surrounding the *Howey Test* in the 74 years since the decision was issued. That litigation has expanded, contracted, and otherwise altered the elements of the test, but the framework of the test has remained the same.

We will review each prong and analyze how it applies to vBit's business specifically to determine whether the managing and hosting of customers mining rigs would be considered an investment contract, and thus, is a security under US law.

### 1.     Investment of Money

The first prong of the *Howey Test* requires that there be an investment of money into the enterprise. This prong has rarely been an issue over the years. Often the answer is so obvious that there is no dispute. In the matter at hand, the customers have invested money through the purchase of the mining rigs and the payment of fees, whether monthly or annually, to host rigs. As is often the case, the first prong is easily satisfied, and we must move on to the next element.

### 2.     Common Enterprise

The second, and most complicated, prong of the *Howey Test* is the presence of a common enterprise. There has been substantial litigation regarding this element, with three separate and distinct tests being used throughout the US to determine commonality. The Supreme Court has yet to step in and provide any guidance as to which of the three competing tests is correct, so all three tests must be reviewed.

The first, and most rigid of the three approaches, is known as horizontal commonality. The horizontal approach analyzes the relationship among investors in a transaction. Specifically, horizontal commonality requires the pooling of investors' contributions, with profits being split on a pro-rata basis. Given this fact, horizontal commonality tends to only be present in those transactions in which numerous investors contribute to a fund and share the returns proportionately.

Horizontal commonality is not present in the vBit transactions as there is no pooling of investor contributions. Further, there is no pro rata share of the profits. Each "investors" profitability is determined by factors individual to their rig and their management of their mining rig. Each rig owner can direct their hashing power at any mining pool in existence. As a result, the success and profitability of the "investment" is dependent on the individual investor's ability to pick the right pool at the right time. As such, the results of each individual miner determine the payments received by the vBit Hosting customers. The success of the other vBit Hosting customers does not affect the payouts to be received by an individual vBit Hosting customer. Given the lack of pooling and pro rata profit distribution, there is no horizontal commonality present in the vBit hosting transactions.

The second test, also known as strict vertical commonality, focuses on the economic relationship between the investor and the promoter or issuer. For a common enterprise to be found using the strict vertical commonality test, the fortunes of the investor and the promoter must be interwoven and mutually dependent. If the fortunes of the promoter and the investors rise or fall together, the strict vertical test is satisfied.

As was the case with horizontal commonality, the "investors" ability to choose which pool they invest in, without the influence of vBit creates a situation where the success of the investor and promoter is not mutually dependent. As an extreme example, a vBit Hosting customer could pay

PRIVILEGED AND CONFIDENTIAL

their monthly fee for an extended period and direct their rig at the worst pool available and experience little success mining. This would have no effect whatsoever on the profitability or success of vBit Hosting. For all intents and purposes, vBit hosting does not share in the risks of the investor. vBit Hosting receives a fee for the services provided whether the miners are successful or not. As such, the transaction at issue does not satisfy the strict vertical commonality test.

Lastly, there is what is called broad vertical commonality. Like strict vertical commonality, the broad approach focuses on the relationship between the investor and promoter. Broad vertical commonality, as its name would indicate, is the most liberal or broadest of the commonality tests. Instead of economic interdependence, the broad vertical test focuses on the investor's dependence on the promoter's expertise. Courts applying the broad vertical test focus on whether the investors' ability to experience profit is inextricably tied to the promoter's skill, expertise, and effectiveness.

As was the case with the previous two tests, the way "investors" can control their mining rigs, specifically which mining pool to join, prevents a finding of broad vertical commonality. As stated above, the biggest determining factor in an individual's success is their ability to pick a good mining pool. Based on our conversations with vBit, the vBit Hosting does not recommend or suggest mining pools for the "investors." Each of the "investors" makes their own decisions on what pool they would like to join. As such, broad vertical commonality does not exist in this transaction.

### 3.    Expectation of Profits

This prong of the test focuses on the motivations of the investors or purchasers. Much like the first element, the "investment of money," this prong or element is often not in dispute. An investment of capital for the purpose of generating returns is all that must be proven to satisfy this element. This prong is present in the vBit transactions. vBit would be hard pressed to argue that the individuals that purchased the mining rigs and paid for hosting of the rigs did not have an expectation of profits. As such, element 3 of the *Howey Test* is satisfied.

### 4.    Solely From the Efforts of Others

The 4th and final prong of the test focuses on the investors' degree of control. The more an investor is involved with the business, or can affect the returns received, the less likely a transaction will be viewed as an investment contract. In the years since *Howey*, this prong has softened some. Courts have interpreted "solely" to mean "largely" or "principally." According to one federal court, the fourth prong of *Howey* focuses on whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."

For lack of a better description, mining cryptocurrencies is like a race. The miner, or pool of miners, that confirms the block fastest and arrives at the right answer to a numerical problem first will receive the reward. Most individual miners mine as part of a larger pool of miners, using their combined hash power to complete blocks faster and increase the chances of receiving the mining reward. Each mining pool is different, including different fees, management algorithms, and, most importantly, success rates.

The customers that use vBit Hosting choose which mining pool their rig will join. As such, the profits of their mining venture are directly, and almost exclusively, determined by the customer's ability to pick a good mining pool and then adjust accordingly as the markets and pool performance

PRIVILEGED AND CONFIDENTIAL

change. Put another way, the vBit Hosting customers determine their own destiny. In addition, the aspects of mining that are controlled by vBit Hosting are inconsequential in comparison to the choice of mining pool, including electricity costs and rig maintenance.

Whether a court focuses on "solely," "largely," or "principally" from the efforts of others, it is clear that the vBit transactions at issue do not satisfy the 4th prong of *Howey* and is therefore, not an investment contract pursuant to *Howey*.

## 5.    Conclusion

As stated above, the *Howey Test* is a considered a conjunctive test, meaning that each element must be present in order for a transaction to be deemed an investment contract. The vBit Retail/vBit Hosting transaction, i.e., the selling of the rigs and providing hosting services, fails to exhibit the required commonality. Under whichever test is used, the non-pooled nature of the investment and the customer's ability to greatly impact the profitability of their investment prevents a finding of commonality. Furthermore, and for similar reasons, the vBit Hosting customers' profits are not derived solely, largely, or principally from the efforts of vBit or anyone else. The customers choose their own mining pools and the pools themselves are the biggest determinant in the customers experiencing profitability.

For these reasons, we do not believe that the transactions at issue qualify as investment contracts pursuant to the *Howey Test*.

## D.  State Securities Laws

In addition to the *Howey Test*, some State courts in the US use what is referred to as the "*Risk Capital Test*" to determine if a transaction is an investment contract under state law. This test is used in conjunction with the *Howey Test* and does not replace or supplant its applicability. In those states that use the *Risk Capital Test*, if a transaction satisfies either test it will be considered a security. In those states that do not have the *Risk Capital Test*, the Courts rely exclusively on the *Howey Test*.

The following states have adopted the use of the *Risk Capital Test* through case law, statute, or regulation: Hawaii, Arkansas, Ohio, Oregon, Alaska, Georgia, Michigan, North Dakota, Oklahoma, Washington, Illinois, New Mexico, North Carolina, Wisconsin and Wyoming. The elements of the test are as follows:

- Whether the funds are being raised for a business venture or enterprise;

- Whether the transaction was offered indiscriminately to the public at large;

- Whether the investors are substantially powerless to affect the success of the enterprise; and

- Whether the investor's money is substantially at risk because it is inadequately secured.

PRIVILEGED AND CONFIDENTIAL

One noticeable difference between the *Risk Capital Test* and the *Howey Test* is that the former does not require an expectation of profit. The *Risk Capital Test* is much more focused on what an investor may lose, as opposed to what they are expecting to gain.

When applying the *Risk Capital Test* to the transactions at issue, namely vBit's hosting of the mining rigs, it is clear that same are not an investment contract. While the first and second prongs of the test are likely, although not guaranteed, to be met, the third and fourth prongs are not present here.

First, the vBit hosting customers are not substantially powerless to affect the success of the enterprise. Specifically, each of the hosting customers can determine which mining pool will receive their available hash power. Choosing the right mining pool is the most significant factor in the profitability of that individual's mining rig. As such, to say that these individuals are powerless to affect the success of the endeavor ignores the facts.

In addition, the transaction also fails the fourth prong, i.e., that the investor's money is substantially at risk because it is inadequately secured. vBit Hosting's customers own the mining rigs outright. While these individuals have entered into agreements for fixed time periods during which their rigs will be hosted or managed by vBit Hosting, they still own the rig, which is significantly more expensive than the hosting fees.

However, at the conclusion of their hosting period, vBit Hosting's customers can request the return/delivery of their mining rigs and operate them on their own with no involvement of any vBit entity. As such, the investor's money is adequately secured by the rig. That being said, the monthly or periodic hosting fees are unsecured, but same were used as consideration for a service the users received and used.

It is important to note that this is a general review of the *Risk Capital Test*. It has been adopted by no less than 15 jurisdictions. Each of these jurisdictions has its own case law, statutes and regulations that affect the analysis of whether a transaction is an investment contract under the test. As such, we cannot make a definitive statement that each state would agree with our analysis above without conducting additional research. However, based on the general application of the *Risk Capital Test*, we believe that the sale of the rigs, when combined with the hosting agreement, is not an investment contract under the test.

### E.  Conclusion

Whether analyzed under state or federal law, the transaction at issue, namely selling mining rigs and then hosting and managing those rigs, is not an investment contract. The 2nd and 4th prongs of *Howey* are not satisfied. There is no common enterprise and the vBit customers are not relying on the efforts of others to experience profits. In addition, the customers' ability to control the profitability of their rig during hosting prevents the transaction from being viewed as an investment contract under state law.

## IV.    vBit Mobile Wallet

### A.  Federal Regulation

#### i.    Introduction to FinCEN and MSBs

PRIVILEGED AND CONFIDENTIAL

The Financial Crimes Enforcement Network, or FinCEN, is an arm of the US Department of the Treasury tasked with combating domestic and international money laundering, terrorist financing, and other financial crimes through the collection and analysis of financial transactions. FinCEN requires companies who deal with virtual currencies (a commodity under US federal legislation) to be registered as money service businesses (MSB).

Most virtual currency related businesses are viewed as money transmitters, and are thus subject to the Bank Secrecy Act (BSA), thereby requiring such businesses to receive the appropriate state and federal licensing to operate as such. The BSA and anti-money laundering (AML) regulations are believed to be vital in the US's fight against money laundering and terrorism.

### ii.    FinCEN Regulations

Based on the current regulations, nearly any entity that deals with virtual currencies is considered an MSB and must register as such. According to FinCEN, the term "money services business" includes any person doing business, whether or not on a regular basis, or as an organized business concern, in one or more of the following capacities:

- Currency dealer or exchanger.

- Check casher.

- Issuer of traveler's checks, money orders or stored value.

- Seller or redeemer of traveler's checks, money orders or stored value.

- Money transmitter.

According to FinCEN, a "money transmitter" is defined as a person who provides money transmission services, or engages in the transfer of funds. "Money transmission services" equal the "acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds or other value that substitutes for currency to another location or person by any means."

Notice the phrase "other value that substitutes for currency"- this specifically accommodated virtual currencies. Further guidance issued by FinCEN makes clear that individuals, who as a business, exchange virtual currency for either fiat or other virtual currency are money transmitters under the law and must register as such.

In addition, FinCEN has also issued guidance regarding whether cryptocurrency wallets are considered MSBs, and therefore, must be registered with FinCEN. FinCEN draws a distinction between wallets that are "hosted," and those that are "unhosted."

Hosted wallet providers are entities that receive, store, and transmit virtual currencies on behalf of their account holders, generally interacting with them through websites or mobile applications. The entity is referred to as the host, the user's account is the wallet, and the accountholder is the wallet owner or user. Gemini would be an example of a hosted wallet. Gemini acts as the host, the users account with Gemini is the wallet, and the user is the wallet holder.

PRIVILEGED AND CONFIDENTIAL

In this model, the value of the virtual currency in the wallet belongs to the user. It may be stored in an individual wallet or commingled. To facilitate activity the owner/account holder interacts with the host and the host has total control over the currency. In this instance the hosted wallet provider is considered a money services business and is required to register as such with FinCEN. This also applies to multi-signature wallets that are hosted.

Unhosted wallets, on the other hand, are typically software hosted on a person's computer, phone or other device that allow the person to store or conduct virtual currency transactions. With unhosted wallets, the owner of the wallet is in complete control of their wallet and does not have to interact directly with a host entity to facilitate transactions. Rather, the owner interacts directly with the payment system and maintains complete control over the virtual currencies stored in its wallet. In so far as an unhosted wallet user is conducting transactions "to purchase goods or services on the user's own behalf, they are not a money transmitter" and do not need to register with FinCEN as such.

One important issue is FinCEN's focus on the requirement that an entity or individual be engaged in "business." Based on our current understanding, vBit Wallet does not charge any fee in connection with the services it offers. As such, there is a strong argument that vBit Wallet is not engaged in the business of money transmission. Under almost all definitions of business there is a profit motive or goal. Obviously, that is not the case with vBit Wallet.

Please be advised that while we believe that a for profit motive is necessary to be considered "in business," there is no guarantee that this interpretation will be accepted by FinCEN and there is risk, potentially substantial risk, that vBit Wallet will be considered a money transmitter and be required to register as an MSB with FinCEN whether or not it is operating as a for profit business.

If that is the case, vBit wallet would be legally obligated to comply with the requirements of FinCEN and other federal statutes discussed below.

### iii.    FinCEN Registration

Assuming vBit Wallet is considered an MSB, it will be required to register with FinCEN by filing Form 107a, entitled "Registration of Money Services Business." The MSB registration form is fairly simply to fill out and seeks general information about the entity seeking the license.

Pursuant to federal regulations, any foreign-located MSBs must "designate the name and address of a person who resides in the United States and is authorized, and has agreed, to be an agent to accept service of legal process with respect to compliance" with federal regulations regarding MSBs "and shall identify the address of the location within the United States" for records relating to the entities MSB registration forms. In addition, the foreign-located MSB's US agent is also responsible for keeping client lists and transactional data records. To the extent that vBit Wallet is a foreign entity, these regulations must be complied with.

### iv.    Creating an AML Program

The Bank Secrecy Act (BSA) requires all MSBs, both principals and their agents, to establish and maintain an effective written AML program reasonably designed to prevent the MSB from being

PRIVILEGED AND CONFIDENTIAL

used to facilitate money laundering and the financing of terrorist activities. Pursuant to regulations, an MSB's AML program must, at a minimum:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA and its implementing regulations, including the adequate monitoring of any agents;

- Designate a person to assure day to day compliance with the program and the BSA and its implementing regulations;

- Provide education and training of appropriate personnel concerning their responsibilities under the program, including training in the detection of suspicious transactions to the extent that the money services business is required to report such transactions under the BSA;

- Include a customer identification, or Know Your Customer (KYC) program; and

- Provide for independent review to monitor and maintain an adequate program

An MSB's AML program should be tailored to reflect the specific risks associated with their business' services, clients, size, location, and circumstances. It is important that an entity provide sufficient resources, both human capital and technology, to facilitate compliance with the BSA and their AML program. Further, FinCEN recommends that MSBs have their program tested by an independent and competent party to ensure compliance.

As such, registration with FinCEN would require vBit Wallet to collect certain information from all of its users, including, but not limited to: name, address, and social security number/tax identification number. Establishment of a robust Know Your Customer (KYC) program is required to meet the reporting obligations of the BSA and other federal regulations. Without collection and retention of this information, it is impossible to meet the reporting requirements.

There are several reports and filings that must be made by FinCEN registered MSBs. For example, all MSBs are required to submit Suspicious Activity Reports (SAR). Specifically, MSBs are required to file a report for any suspicious transactions over $2,000. Suspicious activities include, but are not limited to, transactions involving funds derived from illegal activity, transactions designed to evade the requirements of the BSA, and transactions that appear to serve no business or apparent lawful purpose.

SARs are not to be confused with Currency Transaction Reports (CTR), which are also required to be filed by all FinCEN registered MSBs. CTRs are required any time a cash transaction or series of transactions exceeds $3,000 per person in a single day. MSBs are required to provide the name, address, social security number/tax identification number (for non-US citizens) for every CTR filed. As such, in order to comply with these regulations, vBit Wallet would have to collect this information from each and every one of their customers before allowing them to trade on the platform.

PRIVILEGED AND CONFIDENTIAL

In addition, please be advised that there is currently an effort under way to have the $3,000 threshold requiring the submission of a CTR lowered to $250 on all international transactions. The threshold for US domestic transactions would remain at the $3,000 level. If the change is approved, vBit Wallet would be required to submit CTR's for any international transfers or transmittals over $250.

An additional aspect to consider is the intersection between the Office of Foreign Assets Control (OFAC) and MSBs. In an effort to protect economic interests, national security, and foreign policy, the US government often relies on economic or trade sanctions. Registered MSBs are required to ensure that any funds that pass through their hands are not sent or received in violation of OFAC regulations.

As a result, MSBs are required to ensure that funds are neither sent to, nor received by, any individuals considered Specially Designated Nationals (SDN) or other prohibited persons. This requires a review of every transaction made on the platform to ensure compliance through the establishment of a robust due diligence program.

It is highly recommended that all MSBs consult an AML compliance and OFAC due diligence specialist to assist in the preparation and implementation of their AML and other compliance programs. For many companies, the lack of forethought and adherence to their own compliance programs leads to substantial legal issues that easily could have been avoided. Our firm is more than capable of assisting vBit through this process to ensure that a resilient and adequate AML and KYC program is established.

### B. State Regulation

In addition to the federal regulations discussed above, every state, apart from Montana, has enacted laws that regulate the transmission of money. However, with the exception of Michigan, Missouri, Ohio, and Wisconsin, there is a requirement that an entity or individual be engaged in the "business" of money transmission before a license is required.

Based on our discussions, vBit Wallet does not currently charge any fees to its users in connection with the transfer of money. As was the case above when discussing FinCEN regulations, we would argue that vBit Wallet is not engaged in the "business" of money transmission and nearly all of the state money transmitter laws do not apply.

Specifically, we would argue that the common usage of the word business implies that goods or services are being provided in exchange for some form of consideration with the goal of producing a profit. As a result, we do not believe that vBit Wallet is engaged in the "business" of money transmission.

However, as was stated in connection with the FinCEN analysis included above, please be advised that there is no guarantee that the individual states that contain business engagement language will agree with our interpretation. As a result, the following analysis assumes that they will not agree with our interpretation.

With the exception of Montana, the states each have statutes addressing money transmission. However, nearly half  offer exemptions to licensure relating to businesses who are engaged in the transmission of virtual currencies only. Many states do not consider virtual currencies to be "money."

**PRIVILEGED AND CONFIDENTIAL**

As such, transactions involving only virtual currencies in these states do not involve money and are thus exempt from money transmitter laws. Any entity or individual engaged in the business of transferring fiat currency is almost certainly required to register in all 49 states with money transmission laws.

While the application process for each state is slightly different, there is some general information that nearly all states require. For example, all applicants are required to file documents including, but not limited to:

- financial statements (most require audited financials);
- Company Form (MU1);
- Banking information;
- Control person attestations;
- Credit report;
- AML/BSA policy;
- Business plan;
- Organization charts; and
- Formation documents.

Approximately half of the states have joined the Multistate MSB Licensing Agreement Program (MMLA). The MMLA program was started to increase the efficiency of MSB licensing in the US. The MMLA consists of two phases. During Phase One a single state reviews general application information. Once approved, Phase Two involves providing each state where a license is sought with state specific information requests. Once complete, a license will be granted in all states where the licensee completed Phase Two review. This process saves entities the time and effort of submitting general information about the company for every state where it intends to conduct business. The MMLA has been a great success in streamlining the licensing process.

Included below is an analysis of each state's money transmitter law, application/registration fees and potential exemptions that may be available for vBit Wallet. This analysis assumes that the state regulators will consider the vBit Wallet a business, despite its not-for-profit nature. (Please be advised that some of the state descriptions below discuss exchanges as well. This language was added for the benefit of the discussions of the potential vBit Exchange in later sections of this memorandum).

### <u>Alabama</u>

Cryptocurrency Exemption: No

Registration Fee: $500

Application Fee: $500

Surety Bond Requirement: $100,000-5,000,000 (dependent on volume of business)

MMLA Participant State: No

PRIVILEGED AND CONFIDENTIAL

Pursuant to the Alabama Money Transmitters Act, "monetary value" is defined as a medium of exchange, including virtual or fiat currencies, whether or not redeemable in money. As such, vBit Wallet, as well as a future vBit Exchange, will need a license prior to operating within the state.

## Alaska

Cryptocurrency Exemption: No

Registration Fee: $1,000

Application Fee: $2,000

Surety Bond Requirement: $25,000 ($5,000 got each additional location within state)

MMLA Participant State: No

According to the State of Alaska Division of Banking and Securities, the Alaska Money Transmittal License does not license companies to transmit virtual currencies. Instead, any entities dealing with virtual currency are required to apply for a money transmittal license, and then enter into a Limited Licensing Agreement with the State of Alaska.

As a condition to receiving the license, any entities dealing with virtual currencies must agree that the license will not be used for transferring virtual currency, nor shall it be implied by the entity that the license is for the transmission of virtual currency, and it must be disclosed that the license does not cover the transmission of virtual currency.

There is currently a bill pending before the Alaskan State Legislature (SB 152) that would bring virtual currencies under the umbrella of the state's MTL scheme. No decision has been reached by the state legislature on the pending bill.

Please be advised that we cannot predict whether this measure will pass and be enacted as law, or, if it is passed, how long it would take before the law goes into effect. Based on the current law, vBit Wallet, as well as a future vBit Exchange, would need to enter into a Limited License Agreement with the State of Alaska prior to operating in the state.

## Arizona

Cryptocurrency Exemption: No

Registration Fee: $125-500 (dependent on when during year license is issued)

Application Fee: $1,500

Surety Bond Requirement: $25,000 for 0-5 locations (maximum $500,000)

MMLA Participant State: No

**PRIVILEGED AND CONFIDENTIAL**

Arizona has remained silent as to whether virtual currencies are considered money under the state's money transmitter laws. As such, the only safe assumption that can be made is that entities buying, selling, or transferring virtual currencies are required to register as money transmitter's under Arizona law. A prudent course of action would be for vBit Wallet, and a future vBit Exchange, to request a no-action letter from the state prior to registering as a money transmitter or commencing operations within the state.

## Arkansas

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $750

Application Fee: $1,500

Surety Bond Requirement: $10,000

MMLA Participant State: No

Arkansas law does not specifically state whether entities dealing with virtual currencies are required to be licensed to operate within the state. Rather, Arkansas seems to operate on a case by case basis. An entity looking to operate in Arkansas has two options. The first, and most straightforward, option is that it can simply assume that the law applies to virtual currency transactions and apply for the money transmittal license.

On the other hand, an entity can request a no-action letter from the State of Arkansas Securities Department. A no-action letter is correspondence from a regulator, stating that the intended actions of the entity or individual seeking the no-action letter, would not be in violation of a specific law or regulation.

As recently as  May 2020, the Arkansas Securities Department issued a no-action letter to River Financial, Inc. According to its request for the no-action letter, River described its business model as providing a platform for consumers to buy and sell Bitcoin from its own inventory. River also made clear that all transactions would involve a Bitcoin transfer on one side and an ACH transfer of fiat currency on the other.

Based on the language of the River no-action letter, the distinction for the Arkansas Securities Department seems to be whether an entity offers fiat for fiat transactions. Presumably, if an entity was facilitating transactions that had fiat currency on only one side of the transaction, they would also receive a favorable no-action letter. However, please be advised that we are unable to predict with any real certainty whether an entity will receive a favorable no-action letter from Arkansas without significantly more information.

As such, prior to operation in Arkansas, we would recommend that vBit Wallet, or a future vBit Exchange, seek a no-action letter from the Arkansas Securities Department.

## California

PRIVILEGED AND CONFIDENTIAL

Cryptocurrency Exemption: No

Application Fee: $5,000

Surety Bond Requirement: $250,000-7,000,000

MMLA Participant State: Yes

Pursuant to the California money transmitter laws, "monetary value" is defined as a medium of exchange, whether or not redeemable as money. However, in early 2019, a bill was introduced to the California legislature that would "prohibit a person from engaging in virtual currency business activity, or holding itself out as such, unless licensed or registered with the Department of Business Oversight, subject to a variety of exemptions." The bill was never brought to a vote and "died" in early 2020.

While this proposed legislation may indicate that the state does not believe that the state's current laws do not address virtual currencies, we do not believe that to be the case. We believe that the bill's intent was to remove any doubt, and further confirm that virtual currencies are covered by the law.

Based on the definition of "monetary value" included in the statute, we believe that the proper interpretation of the statute is that virtual currencies are covered by the act and vBit Wallet, and a future vBit Exchange, would need to be licensed as a money transmitter prior to commencing operations in California.

## Colorado

Cryptocurrency Exemption: Possible; Business Model Dependent

Application Fee: $7,500 (if filed Jan.-June); $3,750 (if filed Jul.-Dec.)

Surety Bond Requirement: $1,000,000

MMLA Participant State: No

On September 20, 2018, the State of Colorado issued interim guidance on cryptocurrency and the Colorado Money Transmitters Act (CMTA). The guidance issued by the Colorado Division of Banking's (CO-DOB) focused on whether a person or entity "engaged in the business of buying, selling, and/or facilitating the transfer of cryptocurrency within the state is required to be licensed as a money transmitter under Colorado law."

The CO-DOB makes clear that its position is that virtual currencies are "digital asset[s] that [are] not recognized as legal tender" and that the CMTA aims to "regulate the transmission of money, meaning legal tender." The guidance discusses various types of transactions and the registration requirements, or lack thereof, associated with each.

According to the CO-DOB, the direct transmission of cryptocurrency between two consumers is not subject to licensure under the Act. This exemption indicates that a truly decentralized exchange

PRIVILEGED AND CONFIDENTIAL

would not be subject to licensure as there is no third party, or fiat currency, involved in the transaction.

In addition, in transmissions where a third party is involved, "the complete absence of fiat currency from the transmission from one customer to another is not money transmission," and does not require licensure.

However, transactions involving "fiat currency during a transmission *may* be subject to licensure" under the CMTA. Specifically, the CO-DOB states that licensure would be required:

- When a person is engaged in the business of selling and buying cryptocurrencies for fiat currency; and

- A Colorado customer can transfer cryptocurrency to another customer within the exchange; and

- The exchange has the ability to transfer fiat currency through the medium of cryptocurrency.

If it is unclear whether an entity is engaging in the transfer of fiat currency through the medium of cryptocurrency, the CO-DOB will analyze the entire course of a transaction to determine whether licensure is required under the CMTA.

To be clear, the CO-DOB guidance referenced above is not the law of Colorado and did not alter the current statutes on the books. It merely provides the State's current interpretation of the statute. This guidance can be altered and/or withdrawn by the State at any time. However, in the two years since this guidance was issued, there have been no changes that we have been able to identify.

As is the case with many states, an exemption from registering as a money transmitter in Colorado depends on an entity's business model, specifically the presence/absence of fiat currency in the transaction. Based on our current understanding of vBit Wallet's operations, no fiat currency is being bought, sold, or transferred using the wallet. As such, we believe that vBit Wallet is exempt from registering as a money transmitter under Colorado law. This exemption would also apply to a future vBit Exchange, assuming no fiat currency was being bought, sold, or transferred on the exchange.

## <u>Connecticut</u>

Cryptocurrency Exemption: No

Registration Fee: $1,875

Application Fee: $100

Surety Bond Requirement: $300,000-1,000,000 (dependent on volume of business within the state)

MMLA Participant State: Yes

PRIVILEGED AND CONFIDENTIAL

The money transmitter application for the state of Connecticut clearly states that those engaging in the transmission of virtual currencies are required to be licensed within the state. Specifically, the state of Connecticut defines virtual currencies as:

> [A]ny type of digital unit that is used as a medium of exchange or a form of digitally stored value or that is incorporated into payment system technology. Virtual currency shall be construed to include digital units of exchange that (A) have a centralized repository or administrator; (B) are decentralized and have no centralized repository or administrator; or (C) may be created or obtained by computing or manufacturing effort. Virtual currency shall not be construed to include digital units that are used (i) solely within online gaming platforms with no market or application outside such gaming platforms, or (ii) exclusively as part of a consumer affinity or rewards program, and can be applied solely as payment for purchases with the issuer or other designated merchants, but cannot be converted into or redeemed for fiat currency.

This definition of virtual currencies is so broad, it is unlikely that any cryptocurrencies do not fall within this definition. In addition, the state of Connecticut requires all money transmission applicants to file a disclosure stating whether they will be engaged in the transmission of virtual currencies. As such, virtual currency businesses, such as vBit Wallet, as well as a future vBit Exchange, are required to register as money transmitters under Connecticut law.

## Delaware

Cryptocurrency Exemption: No

Registration Fee: $230 per location (plus $4.60 for each designated agent)

Application Fee: $172.50 (investigation fee)

Surety Bond Requirement: $25,000 ($5,000 for each additional location within the state; $250,000 max.)

MMLA Participant State: No

Delaware's money transmitter laws do not define money or payment instrument. As such, it is unclear whether virtual currency businesses are required to register as money transmitters. Though the state has passed some blockchain friendly legislation, when a state is silent, the only safe assumption is that virtual currency businesses are required to apply for a license under state law. Another alternative would be to request a no-action letter from the state, though there is no indication that the state would respond to such a request favorably, if at all. As stated, with the lack of clarity, the most prudent action would be for vBit Wallet, or a future vBit Exchange, to request a no-action letter from the state or procure a license prior to operation within the state.

## Florida

Cryptocurrency Exemption: No

PRIVILEGED AND CONFIDENTIAL

Application Fee: $375 (plus $38 for each branch office and authorized vendor)

Surety Bond Requirement: $50,000-2,000,000 (dependent on locations, volume, and financial condition)

MMLA Participant State: No

While the Florida money transmitter laws are silent as to whether they apply to virtual currency businesses, court decisions have filled the gap. Florida state courts have held that bitcoin transmission requires licensing as a money transmitter under Florida law. As such, any virtual currency businesses operating within Florida must register as such with the state. That would include both vBit Wallet and a future vBit Exchange.

### Georgia

Cryptocurrency Exemption: No

Registration Fee: $1,150 ($900 annual fee; $250 investigation fee)

Surety Bond Requirement: $100,000-$2,000,000 (dependent on volume of business within the state)

MMLA Participant State: Yes

Georgia law prohibits any person from transmitting money or monetary value, including virtual currency, within the United States or to locations abroad by any and all means without a money transmitter license or pursuant to an exemption from licensure under O.C.G.A. § 7-1-682.

It is highly unlikely that any of the available exemptions apply to a typical virtual currency business such as vBit Wallet or a future vBit Exchange. As such, it is a near certainty that any virtual currency business operating in Georgia needs to register as a money transmitter and, potentially, a seller of payment instruments under Georgia law.

### Hawaii

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $5,000

Application Fee: $5,000

Surety Bond Requirement: $10,000 for initial period of licensure

MMLA Participant State: No

Hawaii has updated their money transmitter laws to define Bitcoin as decentralized virtual currency. In addition, Hawaii law states that decentralized virtual currencies, such as Bitcoin, are not

PRIVILEGED AND CONFIDENTIAL

considered payment instruments and the state's money transmission laws should not be applied to virtual currencies.

However, this does not mean that transacting in virtual currencies other than Bitcoin will be considered outside the scope of the money transmitter laws. In addition, those virtual currency businesses that buy, sell, or transmit fiat currency in addition to their virtual currency business will be required to register as money transmitters under Hawaii law. Based on our current understanding of the operations of vBit Wallet, only Bitcoin transfers are currently being offered. As such, vBit Wallet is likely exempt from registration as a money transmitter under Hawaii law. However, that might not be the case with vBit Exchange and will depend on what markets are being offered on the platform.

## Idaho

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $100

Surety Bond Requirement: $10,000 ($5,000 for each additional in state location; max. $500,000

MMLA Participant State: Yes

The Securities Bureau of the Idaho Department of Finance (ID-DOF) is responsible for the regulation of money transmitters. Like most states, some activity involving virtual currencies may be subject to the Idaho money transmitter laws, while others are not.

The Idaho money transmitter laws apply to any person or entity that "sells or issues payment instruments or who engages in the business of receiving money for transmission or engaging in the business of money transmission, by any and all means including but not limited to payment instruments, wire, facsimile, or electronic transfer."

According to the ID-DOF, if an entity or individual "act[s] as a virtual/digital currency exchanger and accepts legal tender (e.g., government backed/issued 'fiat' currencies) for later delivery to a third party in association with the purchase of a virtual currency, then you must be licensed as a money transmitter with the Department of Finance."

Entities that are facilitating transactions that involve virtual currencies only, are likely exempt from registration with the state of Idaho as a money transmitter. As such, the determination of whether an entity is exempt from registration is highly fact specific. Based on our current understanding of vBit Wallet's operations, it would be exempt from registering with the state of Idaho as a money transmitter. However, that might not be the case with vBit Exchange and will depend on what markets are being offered on the platform.

## Illinois

Cryptocurrency Exemption: Possible; Business Model Dependent

PRIVILEGED AND CONFIDENTIAL

Registration Fee: $100

Application Fee: $100 ($400 Investigation Fee)

Surety Bond Requirement: Greater of $50,000 or 1% of all Illinois activity ($2,000,000 max.)

MMLA Participant State: Yes

The state of Illinois has provided substantial guidance regarding virtual currency and the state's money transmitter laws. In guidance released in 2017, the Illinois Department of Financial and Professional Regulation (IL-DOF) stated that although virtual currencies are "a digital representation of value that is used as a medium of exchange, store of value, or unit of account, they are not considered money for the purposes" of the state's money transmittal laws.

The IL-DOF reaches this conclusion based on its finding that "digital currencies have not been authorized or adopted by a domestic or foreign government as part of its currency."

The IL-DOF unequivocally states that a person or entity engaged in the transmission of solely digital currencies "would not be required to obtain a [money transmittal] license." However, like many states, if fiat currency plays any role in the transactions, registration would be required. According to the IL-DOF's guidance, any entity engaging in transactions that involve both virtual currencies and fiat, should request a determination from the IL-DOF regarding whether such activity will require a license.

As a result, while we believe that vBit Wallet would be exempt from registration with the IL-DOF as a money transmitter, the most prudent course of action would be to request a determination from the IL-DOF prior to operation within the state. An exemption for a future vBit Exchange would be dependent on the markets offered on the platform, specifically the presence of fiat currency.

## Indiana

Cryptocurrency Exemption: Possible: Business Model Dependent

Application Fee: $1,000

Surety Bond Requirement: $300,000

MMLA Participant State: Yes

Virtual currencies are specifically excluded from Indiana's definition of money. As such, companies that deal with virtual currencies only do not have to register as money transmitters under Indiana Law. However, the involvement of fiat currency in purchases, sales, or transactions may necessitate a license. Based on our understanding of vBit Wallet's operations, a license would not be required in Indiana prior to vBit Wallet's operation within the state. An exemption for a future vBit Exchange would be dependent on the markets offered on the platform, specifically the presence of fiat currency.

PRIVILEGED AND CONFIDENTIAL

## Iowa

Cryptocurrency Exemption: No

Registration Fee: $500

Application Fee: $1,000

Surety Bond Requirement: $50,000 (plus $10,000 for each additional location within the state; $300,000 if not locations within the state)

MMLA Participant State: Yes

The Iowa money transmitter laws define money as a medium of exchange authorized or adopted by a domestic or foreign government as a part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance. As a result, virtual currencies are not considered money under Iowa law.

However, Iowa defines money transmission, at least in part, as conducting the business of receiving money or monetary value for transmission. Since the law defines monetary value as a medium of exchange, whether or not redeemable in money, it is highly likely that virtual currency businesses such as vBit Wallet, as well as a future vBit Exchange, are required to register as money transmitters under Iowa law prior to commencing operations within the state.

## Kansas

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $1,750

Surety Bond Requirement: $200,000

MMLA Participant State: Yes

In 2014, the Kansas Office of the State Bank Commissioner (KS-SBC) issued guidance regarding the applicability of the Kansas Money Transmitter Act (KMTA) "to persons or entities engaging in the use and/or transmission of virtual currencies." According to the KS-SBC, the "act of two-party currency exchange by itself is not covered by the KMTA regardless of whether it is sovereign currency being exchanged or virtual currency."

However, the "presence of a third party" is likely to "subject the transaction to the KMTA as 'money transmission.'" The KS-SBC is clear that the guidance provided is not to be applied to transactions involving "centralized virtual currencies." If centralized virtual currencies are involved, the KS-SBC states that anyone engaging in such activity should seek an "individual licensing determination" from the KS-SBC.

PRIVILEGED AND CONFIDENTIAL

According to the KS-SBC, "[c]entralized virtual currencies are created and issued by a specified source. They rely on an entity with some form of authority or control over the currency. Typically, the authority behind a centralized virtual currency is also the creator."

The guidance then moves on to transactions involving decentralized virtual currencies, which it defines as: "virtual currencies [that] are not created or issued by a particular person or entity, have no administrator, and have no central repository." After taking the position that decentralized currencies are neither "money" nor "monetary value," as same are defined by the KMTA, the KS-SBC concludes that transactions involving decentralized virtual currencies do not qualify as "money transmission" under the act.

As we have seen with other states, the involvement of "sovereign currency in a transaction," may possibly be considered money transmission under the KMTA and require licensing.

The KS-SBC provides "common types of transactions involving cryptocurrency," and how same will be treated under the KMTA. According to the KS-SBC, "[e]xchange of one cryptocurrency for another cryptocurrency is not money transmission. Regardless of how many parties are involved, since cryptocurrency is not considered "money" under the KMTA, no money transmission occurs."

Whether an entity is required to register as a money transmitter in Kansas centers on the centralized or decentralized nature of the virtual currencies involved in the transactions it facilitates, and the presence of fiat. The KS-SBC guidance does label Bitcoin as a decentralized currency. However, it is silent as to all others, and we have been unable to locate any guidance or no-action letter from the KS-SBC addressing additional virtual currencies.

As such, the most prudent course would be for an entity to submit a request to the KS-SBC requesting a determination as to whether such virtual currencies are centralized or decentralized. However, based on our understanding of vBit Wallet, i.e., the only services offered by the wallet involve the transfer of Bitcoin only, vBit Wallet is exempt from registration as a money transmitter under Kansas law. An exemption for a future vBit Exchange would be dependent on the markets offered on the platform.


## Kentucky

Cryptocurrency Exemption: No

Registration Fee: $1,1000 (Includes processing fee)

Surety Bond Requirement: $500,000

MMLA Participant State: Yes

The state of Kentucky has not provided any guidance as to whether the state's money transmitter laws apply to virtual currencies. However, the state does require licensing for the transmission of monetary value, which is defined as a medium of exchange, whether or not redeemable in money. Therefore, it is highly likely that virtual currency are "monetary value" and entities such as vBit Wallet, and a future vBit Exchange are required to be licensed as money transmitters prior to operating within the state of Kentucky.

PRIVILEGED AND CONFIDENTIAL

## Louisiana

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $1,000

Application Fee: $2,000

Surety Bond Requirement: $25,000 ($5,000 for each additional location within the state)

MMLA Participant State: Yes

In August 2014, the Louisiana Office of Financial Institutions (LA-OFI) issued guidance entitled "Consumer and Investor Advisory on Virtual Currency." In reference to "companies dealing in virtual currencies," the LA-OFI states that any entity that would qualify as an "exchanger" under the March 2013 guidance provided by FinCEN would be subject to licensure under the state's money transmitter laws.

Pursuant to FinCEN guidance an exchanger is a person or business "engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency." Based on our understanding of vBit Wallet's operations, we do not believe that it needs to be licensed to operate in the state of Louisiana as it does not offer any exchange functions. However, a future vBit Exchange would certainly be required to register as a money transmitter.

## Maine

Cryptocurrency Exemption: No

Registration Fee: $50 for each authorized delegate ($2,500 max.)

Application Fee: $500

Surety Bond Requirement: $100,000

MMLA Participant State: Yes

The state of Maine has not provided any specific guidance as to whether its state's money transmitter laws apply to virtual currencies. In addition, the Maine money transmitter law's definition of payment instrument is extremely broad and likely would include virtual currencies. As such, it is highly likely that the Maine money transmitter laws apply to virtual currency businesses and a license is required.

The state senate has introduced a bill that would explicitly include virtual currencies in the definition of money transmission. Passage of which would eliminate any grey area. While some argue that this is an admission by the state that the current money transmitter laws do not apply to virtual currencies, we disagree with such a contention. Given the grey area created by the language,

PRIVILEGED AND CONFIDENTIAL

the legislature appears to simply be trying to clarify the state's position. We do not believe that the introduction of the bill is an admission that the current statute does not cover virtual currencies.

vBit Wallet needs to be licensed by the state of Maine prior to operation within the state. A future vBit Exchange would also require a license in the state of Maine prior to commencing operations.


## Maryland

Cryptocurrency Exemption: No

Registration Fee: $2,000 (additional $1,000 investigation fee)

Application Fee: $100

Surety Bond Requirement: $150,000

MMLA Participant State: Yes

While there had been some confusion over the years regarding exemptions under the Maryland money transmitter laws for virtual currencies, there is no longer any such confusion. The Maryland transmitter license application now states, "Virtual currency is 'monetary value,' and accordingly is subject to the Maryland Money Transmission Act. Unless otherwise exempt, a person who engages in the business of money transmission utilizing virtual currency must be licensed in accordance with this statute."

As a result, vBit Wallet, as well as a future vBit Exchange, must become licensed as a money transmitter under Maryland law prior to operating within the state.


## Massachusetts

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $1,000

Application Fee: $300

Surety Bond Requirement: $50,000 + twice the average weekly funds deposited by Massachusetts consumers for remittance to foreign countries

MMLA Participant State: No

While Massachusetts does have a money transmitter statute, the statute is not concerned with domestic money transmission, but rather money transmission to foreign countries. According to the statute, "all persons who engage or are financially interested in the business of receiving deposits of money for the purpose of transmitting the same or equivalents thereof to foreign countries must obtain a license from the Massachusetts Office of Consumer Affairs and Business Regulation."

PRIVILEGED AND CONFIDENTIAL

In 2018, CEX.io sought an opinion from the Massachusetts Division of Banks (MA-DOB) regarding whether their business was required to be licensed pursuant to the state's MTL statute.

As background, CEX operates a centralized exchange that allows its customers to buy, sell and trade cryptocurrencies and fiat. Customers can fund their CEX accounts with either fiat or crypto and all fiat currency is maintained in pooled accounts. CEX does not allow, or facilitate, the buying or selling of one fiat currency for another, i.e. traditional foreign exchange trading or forex trading.

CEX offers both "instant purchase transactions" (i.e., trading at market) and "order book exchange" transactions (i.e., stop or limit orders). According to its representations to the MA-DOB, CEX is not a party to any of the transactions on the exchange and does not trade on its own account. Furthermore, as a licensed MSB under FinCEN, CEX is required to comply with KYC/AML reporting requirements.

The MA-DOB found that "[i]n the virtual currency transaction exchange system operated by CEX, the user is not transmitting funds to recipients in a foreign country." Rather, the user was placing their "[fiat] in a pooled account, or virtual currency into his/her own virtual currency wallet, and engaging in purchases, sales, or exchanges of virtual currency through the CEX system."

In addition, the opinion from the MA-DOB states that CEX does not "accept user funds for the purpose of transmitting those funds or their equivalents to foreign countries, as CEX users do not know the identity of the other party to a transaction," and they lacked the ability to select the person they are transacting with. For these reasons, the MA-DOB opined that CEX.io was not required to be licensed as a foreign transmittal agency.

As a result, the availability of an exemption under the Massachusetts money transmitter laws is dependent on the business model of the potential licensee. Based on our understanding of vBit wallet's operations, its users can send virtual currencies, specifically bitcoin, to wallets located anywhere in the world. Therefore, to the extent that citizens of Massachusetts can use vBit wallet to transfer funds internationally, vBit Wallet needs to be licensed prior to operation within the state of Massachusetts.

However, based on the MA-DOB's response to CEX.io, a new vBit Exchange that closely patterns the model of CEX.io would not be required to be licensed.

## Michigan

Cryptocurrency Exemption: No

Registration Fee: $3,050

Application Fee: $600

Surety Bond Requirement: $500,000 ($10,000 for each additional location and authorized delegate; $1,500,000 max.)

MMLA Participant State: No

PRIVILEGED AND CONFIDENTIAL

The state of Michigan's money transmittal law does not explicitly state whether it applies to virtual currencies. However, the definition of money transmission under the law does include receiving monetary value for transmission. Unfortunately, the law does not define monetary value. As a result, it is not entirely clear whether virtual currency businesses must register as money transmitters in Michigan. Based on the common usage of monetary value in other states, it is likely that vBit Wallet, as well as a future vBit Exchange is required to be licensed prior to operating in the state of Michigan. Also, please be advised that Michigan is one of the few states that does not include a provision that money transmitters be engaged in business. As a result, even with vBit Wallet's not-for-profit model, a license would still be required before operating in Michigan.

## Minnesota

Cryptocurrency Exemption: No

Application Fee:  $4,000

Surety Bond Requirement: $50,000 min. (determined by number of locations and authorized delegates)

MMLA Participant State: Yes

The Minnesota money transmitter laws do not explicitly discuss virtual currencies, nor does it define "monetary value." Further, the state has not provided any specific guidance as to whether its money transmitter laws apply to virtual currencies. However, the statute's definition of payment instrument is extremely broad and likely would include virtual currencies. As such, it is highly likely that the Minnesota money transmitter laws apply to virtual currency businesses and registration, by both vBit Wallet and a future vBit Exchange, is required.

## Mississippi

Cryptocurrency Exemption: No

Application Fee: $750 (additional $50 investigation fee)

Surety Bond Requirement: $25,000-500,000 (dependent on locations, business volume, and financial condition)

MMLA Participant State: Yes

Pursuant to the Mississippi state money transmitter laws, money transmission means to engage in the business of receiving monetary value for transmission including but not limited to wire, facsimile or electronic transfer. Further, monetary value is defined as a medium of exchange, whether or not redeemable in money. This definition would appear to include virtual currencies and vBit Wallet, as well as a future vBit Exchange, is required to be licensed prior to operation within the state of Mississippi.

PRIVILEGED AND CONFIDENTIAL

## Missouri

Cryptocurrency Exemption: No

Registration Fee: $300

Surety Bond Requirement: $100,000

MMLA Participant State: No

Missouri is another state that fails to define money in its money transmitter laws. With no definition of money or payment instrument there is no way of being sure whether virtual currencies are exempt from registration. Until the state amends the laws, or provides specific guidance, it is unclear.

The most prudent course is to assume that virtual currencies are covered by the Missouri money transmitter laws and seek a license prior to operating within the state. Alternatively, vBit Wallet, or a future vBit Exchange, could request a no-action letter from the state regulators to determine if there is an available exemption.

In either case, we recommend additional action prior to vBit Wallet operating in the state of Missouri. Also, please be advised that Missouri is one of the few states that does not include a provision that money transmitters be engaged in business. As a result, even with vBit Wallet's not-for-profit model, a license would still be required before operating in Missouri.

## Montana

Cryptocurrency Exemption: N/A

Registration Fee: N/A

Application Fee: N/A

Surety Bond Requirement: N/A

MMLA Participant State: N/A

The state of Montana is notable in that it is the only state in the country that does not have any money transmittal laws. While Montana has passed laws requiring the reporting of political contributions made via bitcoin, it has taken a hands-off approach as it concerns the operation of exchanges and other cryptocurrency related businesses in the state. Montana is considered by many to be the most cryptocurrency friendly state in the United States. While there is no guarantee that Montana will continue to take a hands-off approach, currently there is no license to be sought.

## Nebraska

PRIVILEGED AND CONFIDENTIAL

Cryptocurrency Exemption: No

Registration Fee: $1,000

Surety Bond Requirement: $100,000-250,000 (dependent on business volume)

MMLA Participant State: Yes

Nebraska's money transmittal laws do not explicitly state that it applies to virtual currencies. However, based on the statute's definition of money transmission and monetary value, virtual currency businesses are likely required to register. Although currently postponed indefinitely, there are several pieces of legislation that would clearly place virtual currencies under the purview of the Nebraska money transmitter laws. This should not be seen as an admission by the legislature that virtual currencies are not covered by the current statute, but rather an effort to clarify the issue. As such, it is highly recommended that vBit Wallet, and any future vBit Exchange, get licensed in Nebraska prior to commencing operations in the state.


## Nevada

Cryptocurrency Exemption: Possible, Business Model Dependent

Registration Fee: $200-400

Application Fee: $500

Surety Bond Requirement: $10,000 ($5,000 for each additional location within the state; $250,000 max.)

MMLA Participant State: No

Nevada's money transmitter laws do not explicitly address whether virtual currency businesses must seek licensure within the state. The statute does not define money transmission or money, making a specific determination regarding its applicability to virtual currency based on the language of the statute alone nearly impossible.

However, in separate guidance the Nevada Financial Institutions Division (NV-FID) has stated that the requirement of a license is dependent on the potential licensee's business model and any entities looking to operate within the state should seek specific guidance from the NV-FID. Therefore, vBit Wallet, as well as a future vBit Exchange, should contact the NV-FID for a determination as to whether a license is required prior to operation within the state.

Furthermore, if an entity intends to serve as digital custodian for any form of digital currency, the business may be considered a trust under Nevada law and have to register as such, and comply with all applicable rules and regulations for trust companies within the state.


## New Hampshire

PRIVILEGED AND CONFIDENTIAL

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $500

Surety Bond Requirement: $100,000

MMLA Participant State: No

In 2017, the state of New Hampshire amended its money transmitter statutes to exempt "persons who engage in the business of selling or issuing payment instruments or stored value solely in the form of convertible virtual currency or receive convertible virtual currency for transactions to another location" from registering for a money transmission license.

However, it should be noted that this exemption does not apply to virtual currency businesses that offer customers the ability to buy, sell and transfer fiat currency. Based on our current understanding of vBit Wallet's operations, a money transmitter license would not be required prior to offering its services within the state of New Hampshire. However, depending on the specific business model of a future vBit Exchange, a license may be required prior to commencing operations in New Hampshire.

## New Jersey

Cryptocurrency Exemption: Possible; Business Model Dependent

Application Fee: $700

Surety Bond Requirement: $100,000-1,000,000 (determined on case by case basis)

MMLA Participant State: No

The State of New Jersey does not explicitly state whether its money transmitter laws apply to virtual currency businesses operating within the state. However, based on the definitions provided in the NJ money transmitter laws, virtual currencies do not qualify as "money" or "payment instrument" under the statute. As such, vBit Wallet, as well as a future vBit Exchange, would not need to be licensed prior to operation within the state of New Jersey. However, to the extent that a virtual currency business also provides services related to fiat currency, it likely needs to register as a money transmitter with the state.

## New Mexico

Cryptocurrency Exemption: No

Registration Fee: $2,000

Application Fee: $2,000

PRIVILEGED AND CONFIDENTIAL

Surety Bond Requirement: $300,000-2,000,000 (depends on business volume; could be up to $5,000,000 if poor financial condition)

MMLA Participant State: No

The New Mexico Financial Institutions Division (NM-FID) has stated that based on the definitions contained within the state money transmitter laws "any entity engaged in the business of providing the exchange of virtual currency for money or any other form of monetary value or stored value to persons located in the State of New Mexico must be licensed by the FID as a money transmitter." As such, vBit Wallet, and any future vBit Exchange, must be licensed prior to operating within the state of New Mexico.


## New York

Cryptocurrency Exemption: No

Registration Fee: $300

Application Fee:

Surety Bond Requirement: $500,000 minimum (can be more depending on business model)

MMLA Participant State: No

A money transmitter license is required for all virtual currency businesses prior to operating in the state of New York. In addition to registering as a money transmitter, virtual currency businesses will also need to seek a Bitlicense to operate in the state of New York. Bitlicenses are almost impossible to receive and have significant additional costs. For example, the application fee is $5,000 and the process is extremely onerous. As such, it is very difficult, if not impossible, for virtual currency businesses to operate in the state of New York.


## North Carolina

Cryptocurrency Exemption: Possible; Business Model Dependent

Application Fee: $1,500

Surety Bond Requirement: $150,000-250,000 (dependent on business volume)

MMLA Participant State: Yes

The North Carolina money transmitter act defines "money transmission" as the "act of engaging in the business of receiving money or monetary value for transmission within the United States or to locations abroad by any and all means, including payment instrument, wire, facsimile, or electronic transfer," and further defines "monetary value" as a "medium of exchange, whether or not redeemable in money."

PRIVILEGED AND CONFIDENTIAL

The North Carolina Commissioner of Banks, the organization tasked with regulating money transmitters in NC, has stated that "virtual currency is a form of monetary value." However, there is one caveat. According to the NC-COB, a business that sells its own stock of virtual currency is generally not considered a virtual currency transmitter under the NC law. In contrast, an exchanger that holds customer funds while arranging a satisfactory buy/sell order with a third party, and transmits virtual currency and fiat currency between buyer and seller, will typically be considered a virtual currency transmitter.

As such, vBit Wallet, and any future vBit Exchange, will need to be licensed by the state of North Carolina prior to operation within the state.

## **North Dakota**

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $400

Application Fee: $450

Surety Bond Requirement: $150,000

MMLA Participant State: Yes

North Dakota's money transmitter laws do not explicitly exclude virtual currencies. However, the laws do include "monetary value" as a medium of exchange. Not surprisingly this led to confusion regarding whether a money transmittal license was required in North Dakota for businesses dealing with the transmission of virtual currencies.

Over the last few years, North Dakota has issued guidance on exactly how the state's money transmitter laws relate to the buying, selling and transmission of virtual currencies. Currently, North Dakota does not consider the control or transmission of virtual currency, in and of itself, to fall under the scope of the money transmittal laws.

To the extent that an entity does not facilitate the transmission of fiat currency to third parties, registration with the state is not required. To the extent that fiat is maintained in a digital wallet for the customers and the only fiat transfers are to other accounts owned and controlled by the customer, a license is not required.

However, if an entity holds or transmits fiat currency to facilitate peer-to-peer or business-to-business transactions, it will need to register for, and secure, a money transmitter license from the state. Based on our understanding of vBit Wallet's current model, a license is not required to operate within the state of North Dakota. A future vBit Exchange may need to register, depending on its proposed business model.

## **Ohio**

Cryptocurrency Exemption: No

PRIVILEGED AND CONFIDENTIAL

Application Fee: $5,000

Surety Bond Requirement: $300,000

MMLA Participant State: Yes

The state of Ohio has not explicitly stated whether virtual currency businesses are required to be licensed in the state. Further, the state statutes do not define money or payment instrument. This makes it exceedingly difficult to provide a concrete answer as to whether a license is required.

However, the money transmitter application requires virtual currency businesses to provide a current third-party security audit of all relevant computer and information systems with their application. This requirement is some indication that the state of Ohio believes virtual currency businesses such as vBit Wallet, and a future vBit Exchange, are required to register within the state prior to commencing operations. However, without further guidance from the state, it is difficult to make an accurate prediction regarding licensing requirements. Also, please be advised that Ohio is one of the few states that does not include a provision that money transmitters be engaged in business. As a result, even with vBit Wallet's not-for-profit model, a license would still be required before operating in Ohio.

### Oklahoma

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $2,000

Application Fee: $3,000

Surety Bond Requirement: $50,000 ($10,000 for each additional location; max. $500,000)

MMLA Participant State: No

The Oklahoma Money Transmitter act does not explicitly discuss the treatment of virtual currency businesses. According to the statute, "Money" is defined as a "medium of exchange that is authorized or adopted by the United States or a foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more governments." Clearly virtual currencies would not fall into this category. The state has provided no additional guidance in connection with virtual currency businesses as money transmitters under Oklahoma law.

However, the involvement of fiat currency in purchases, sales, or transactions will almost certainly necessitate a license. Despite vBit Wallet's current model, the prudent action would be to seek a license or a no action letter from the state. However, without further guidance it is difficult, if not impossible, to determine whether a license is required. Further, an exemption for a future vBit Exchange would be entirely dependent on the proposed business model, specifically what markets will be offered.

**PRIVILEGED AND CONFIDENTIAL**

## Oregon

Cryptocurrency Exemption: No

Application Fee: $1,000

Surety Bond Requirement: $25,000 ($5,000 for each additional location; max. $150,000)

MMLA Participant State: No

Oregon law requires virtual currency businesses to obtain a money transmitter license. Under the Oregon Money Transmitter Act, those who are selling or issuing virtual currencies or engaged in the business of operating virtual currency exchanges within the U.S. or to locations abroad by payment instrument, wire, facsimile, electronic transfer, or any other means are required to obtain a money transmitter license.

Oregon's money transmittal laws define "money" as "a medium of exchange that: (a) The United States or a foreign government authorizes or adopts; or (b) Represents value that substitutes for currency but that does not benefit from government regulation requiring acceptance of the medium of exchange as legal tender." It is clear that the second half of this definition applies to virtual currencies.

As a result, vBit Wallet is required to be licensed as a money transmitter prior to commencing operations within the state of Oregon. A future vBit Exchange would also be required to get licensed prior to commencing operations.

## Pennsylvania

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $5,000

Surety Bond Requirement: $1,000,000

MMLA Participant State: No

In response to multiple inquiries, the Pennsylvania Department of Banking and Securities (PA-DOB) issued guidance regarding the intersection of the state's Money Transmitter Act and virtual currencies. According to the guidance, "only fiat currency, or currency issued by the United States government, is 'money' in Pennsylvania" and "virtual currency, including Bitcoin, is not considered 'money' under the MTA."

According to the PA-DOB, virtual currency exchanges never directly handle fiat currency. Any fiat currency paid by, or to, the customer is "maintained in a bank account in the Platform's name at a depository institution." There is no transferring of "money from a user to another user or 3rd party, and the Platform is not engaged in the business of providing payment services or money

PRIVILEGED AND CONFIDENTIAL

transfer services." In so far as an exchange adheres to this business model, under the Pennsylvania MTA, exchanges "are not money transmitters."

As a result, vBit wallet is currently exempt from needing a money transmitter license to operate within the state of Pennsylvania. In addition, a future vBit Exchange may qualify for an exemption as well, depending on its proposed business model.

## Rhode Island

Cryptocurrency Exemption: No

Registration Fee: $1,000

Application Fee: $500

Surety Bond Requirement: $50,000

MMLA Participant State: Yes

Effective January 1, 2020, Rhode Island law requires that any entity that maintains control of virtual currencies or facilitates transactions involving virtual currencies on behalf of others, is required to obtain a Rhode Island money transmitter license. For purposes of the act, virtual currency means "a digital representation of value that: (A)[i]s used as a medium of exchange, unit of account, or store of value; and (B) [i]s not legal tender, whether or not denominated in legal tender."

As a result, vBit Wallet is required to be licensed prior to commencing operations in the state of Rhode Island. In addition, any future vBit Exchange would also be required to receive a license prior to operating within the state.

## South Carolina

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $750

Application Fee: $1,500

Surety Bond Requirement: $50,000 ($10,000 for each additional location; $250,000 max.)

MMLA Participant State: No

Money transmission in South Carolina is governed by the South Carolina Anti-Money Laundering Act. As is the case with many states, the act does not specifically address activity involving virtual currency. According to the statute, money transmission is defined as "selling or issuing payment instruments, stored value, or receiving money or monetary value for transmission." Monetary value is defined by the Act as "a medium of exchange, whether or not redeemable in money." This would seem to encompass all cryptocurrency.

PRIVILEGED AND CONFIDENTIAL

However, in a December 2018 interpretive order, the Money Services Division of the South Carolina Attorney General's Office (SC-MSD) stated that an "important characteristic of virtual currencies is that they have no intrinsic or set value per unit. Additionally, virtual currencies are not generally accepted as payment throughout the entire economy." As such, the SC-MSD stated that in its view, "virtual currencies lack the characteristics of mediums of exchange" and therefore, "virtual currencies alone do not qualify as monetary value."

The SC-MSD does state however, "to the extent that virtual currency transactions also involve the transfer of fiat currency, they may be subject to money transmission regulations under the Act." Based on our understanding of vBit Wallet's current model, a money transmitter license is not required for vBit Wallet prior to operating in South Carolina. A future vBit Exchange may have to register depending on business model.

## South Dakota

Cryptocurrency Exemption: No

Application/Registration Fee: $1,6000

Surety Bond Requirement: $100,000

MMLA Participant State: Yes

Although the South Dakota money transmitter laws do not explicitly discuss virtual currencies, monetary value is defined as a "medium of exchange, whether or not redeemable in money." This definition would likely include virtual currencies as well as fiat currency. As a result, all virtual currency businesses, including vBit Wallet, as well as a future vBit Exchange, must be licensed as money transmitters prior to commencing operations within the state of South Dakota.

## Tennessee

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $250

Surety Bond Requirement: $50,000 ($10,000 for each additional location; $800,000 max.)

MMLA Participant State: Yes

The Tennessee Money Transmitter Act fails to directly address virtual currencies. However, the state issued a memorandum in December 2015 to address the issue. Like many other states, the Tennessee Department of Financial Institutions (TN-DFI) determined that virtual currencies "do not have all the attributes of real currencies."

Specifically, the TN-DFI held that "virtual currencies exist outside of the established financial systems" and that "cryptocurrency is not money under the Tennessee Money Transmitter

PRIVILEGED AND CONFIDENTIAL

Act," and thus, the act does not apply. However, when a transaction involves both cryptocurrencies and fiat, it "may be money transmission depending on how the sovereign currency is handled."

Based on our understanding of vBit Wallet's current model, a money transmitter license is not required for vBit Wallet prior to operating in Tennessee. A future vBit Exchange may need to be licensed depending on business model.

## Texas

Cryptocurrency Exemption: Possible; Business Model Dependent

Application Fee: $10,000

Surety Bond Requirement: $300,000

MMLA Participant State: Yes

There are two potential licensing schemes in Texas. First, is the traditional money transmitter license present in most states. Texas provided guidance on virtual currencies in 2019. Therein, the Texas Department of Banking stated that because cryptocurrency is not money under the Money Services Act, receiving it in exchange for a promise to make it available at a later time or different location, is not money transmission.

However, the guidance does make clear that the inclusion of sovereign currency in a transaction may be money transmission and require a license, depending on how the sovereign currency is handled. Based on our understanding of vBit Wallet's current model, a license would not be required prior to commencing operations in the state of Texas.

In addition, Texas also has a separate currency exchange license. However, the TX-DOB has stated that "[e]xchanging virtual currency for sovereign currency is not currency exchange under the Texas Finance Code." The TX-DOB continued, stating that "absent a legislative change to the statute, no currency exchange license is required in Texas to conduct any type of transaction exchanging virtual with sovereign currencies." Based on this language, and the TX-DOB's position that virtual currencies are not money, an exchange of one virtual currency for another virtual currency would also not require a currency exchange license. A future vBit Exchange may need to be licensed, depending on the proposed business model.

## Utah

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $300

Surety Bond Requirement: $50,000

MMLA Participant State: Yes

PRIVILEGED AND CONFIDENTIAL

Unlike many of the states we have discussed, Utah's money transmission statute clearly exempts virtual currencies. While the statute defines money transmission as "the sale or issuance of a payment instrument or engaging in the business of receiving money for transmission or transmitting money within the United States or to locations abroad by any and all means, including payment instrument, wire, facsimile, or electronic transfer," it also clearly states that money transmission "does not include a blockchain token."

As such, vBit Wallet does not require a license prior to operating within the state of Utah. However, to the extent that vBit Wallet, or a future vBit Exchange, facilitates fiat currency transactions, a money transmitter license is almost assuredly required.

## Vermont

Cryptocurrency Exemption: No

Registration Fee: $1,000

Application Fee: $1,000

Surety Bond Requirement: $100,000 ($10,000 for each additional agent; max. $500,000)

MMLA Participant State: Yes

The State of Vermont has always taken the position that virtual currency is a form of monetary value subject to the requirements of the Vermont Money Services Act. Further, in May 2017, the Vermont legislature amended the act to add a definition of virtual currency.

Pursuant to the amendment; virtual currency means "a digital representation of value that (A) can be a medium of exchange, a unit of account, or a store of value; (B) has an equivalent value in money or acts as a substitute for money; (C) may be centralized or decentralized; and (D) can be exchanged for money or other convertible virtual currency."

As a result, vBit Wallet, as well as a future vBit Exchange, need to be registered as money transmitters prior to commencing operations within the state.

## Virginia

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $1,000

Surety Bond Requirement: $25,000 (may be subject to increase at Commission's discretion)

MMLA Participant State: No

Virginia's money transmittal laws are silent as to whether they apply to the transmission of virtual currencies. However, Virginia issued guidance, in the form of a "Notice to Virginia Residents

PRIVILEGED AND CONFIDENTIAL

Regarding Virtual Currency." Therein, the Virginia Bureau of Financial Institutions (VA-BFI) stated that it "does not currently regulate virtual currencies." However, the VA-BFI made clear that virtual currency transactions that "also involve the transfer of fiat currency . . . may be regulated under" Virginia's money transmittal laws.

Therefore, vBit Wallet, and any future vBit Exchange, must be licensed as a Virginia money transmitter prior to commencing operations within the state.

## Washington (State)

Cryptocurrency Exemption: No

Registration Fee: $100

Application Fee: $1,000

Surety Bond Requirement: $10,000-550,000 (dependent on business volume)

MMLA Participant State: Yes

Under the Washington Uniform Money Services Act "money transmission" is defined as "receiving money or its equivalent value (equivalent value includes virtual currency) to transmit, deliver, or instruct to be delivered to another location, inside or outside the United States, by any means including but not limited to by wire, facsimile, or electronic transfer." This extremely broad definition would appear to cover the transmission of virtual currencies. As a result, vBit Wallet, and any future vBit Exchange, must be licensed as a money transmitter prior to operating within the state of Washington.

## West Virginia

Cryptocurrency Exemption: No

Registration Fee: $1,000

Application Fee: $100

Surety Bond Requirement: $100,000-1,000,000 (depends on business model and volume)

MMLA Participant State: No

While the West Virginia money transmitter laws do not define money, the statute defines "money transmitter" as "engaging in the business of selling or issuing checks or the business of receiving currency, the payment of money, or other value that substitutes for money by any means for the purpose of transmitting." The transmission of virtual currencies would appear to fall within the definition of money transmission provided by the state. Therefore, vBit Wallet, and any future vBit Exchange, would need to be licensed as a money transmitter prior to commencing operations in the state of West Virginia.

PRIVILEGED AND CONFIDENTIAL

## Wisconsin

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $500 ($300 Investigation Fee)

Surety Bond Requirement: $10,000 ($5,000 for each additional location; $300,000 max.)

MMLA Participant State: No

In the state of Wisconsin, money transmission is governed by the "Seller of Checks" law. Sellers of checks are entities engaged in the business of transmitting money and/or selling or issuing checks, including money orders, traveler's checks, and prepaid cards.

Pursuant to guidance provided by the Wisconsin Department of Financial Institutions (WI-DFI), the "Seller of Checks" law does not currently give the WI-DFI the authority to regulate virtual currency. The WI-DFI is "therefore unable to license or supervise companies whose business activities are limited to those involving virtual currency."

However, as is to be expected, "should the transmission of virtual currency include the involvement of sovereign currency, [a business] may be subject to licensure depending on how the transaction is structured."

As a result, based on vBit Wallet's current model, it would not need to be registered in the state of Wisconsin prior to commencing operations. Also, please be advised that Wisconsin is one of the few states that does not include a provision that money transmitters be engaged in business. As a result, even with vBit Wallet's not-for-profit model, a license would still be required before operating in Wisconsin before vBit Wallet began offering the transferring of fiat currency. An exemption for a future vBit Exchange would be dependent on the proposed business model.

## Wyoming

Cryptocurrency Exemption: Possible; Business Model Dependent

Registration Fee: $1,500

Surety Bond Requirement: $10,000-500,000 (dependent on volume of business)

MMLA Participant State: Yes

In 2018, the state of Wyoming amended the exemptions section of its money transmittal laws to include "[b]uying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any mean" as exempt activities under the law. Therefore, vBit Wallet's current business model would not require a license prior to commencing operations within the state of Wyoming.

PRIVILEGED AND CONFIDENTIAL

However, the introduction of fiat currency to the transactions would require vBit Wallet to receive a license prior to operations. As a result, the business model of any future vBit Exchange would determine whether a license is required.

### C. Conclusion

As discussed herein, vBit Wallet hosts a bitcoin only wallet. The wallet users are not capable of buying or selling bitcoin in the wallet. The functionality of the wallet is limited to the sending and receiving of bitcoin only. vBit Wallet does not receive any fees, payments, or commissions in exchange for the use of its platform.

Both state and federal regulation require that an entity or individual be engaged in the business of money transmission before registration is required. It is our belief that the not-for-profit nature of vBit Wallet would exempt it from being required to register as a money services business or as a money transmitter.

As discussed, Michigan, Missouri, Ohio, and Wisconsin do not contain the same business engagement language as the other states or federal regulations. See the individual descriptions for these states contained above to determine if vBit Wallet needs to register in those states prior to commencing operations.

While we believe that the not-for-profit nature of vBit Wallet may exempt it from registration with FinCEN and nearly all of the states, there is certainly a chance that the regulators and courts disagree with our interpretation. As a result, we have provided information regarding what is required to register with FinCEN and each of the 50 states. The most prudent course of action would be to assume that the regulators will consider vBit Wallet to be engaged in the business of money transmission and to act accordingly.

### V.      Operating an Exchange

### A. FinCEN

As discussed herein, vBit is considering launching an exchange platform. A new vBit Exchange, as we have been calling it, will be required to register as an MSB with FinCEN prior to commencing operations in the US. As opposed to the vBit Wallet, the vBit Exchange will be operating as a for profit business. Therefore, there is no potential argument that it is not engaged in the business of money transmission and does not need to be registered.

As discussed in further depth above, there are significant obligations associated with registering with FinCEN and complying with the Bank Secrecy Act, including, but not limited to, development of a rigorous AML and KYC program and the preparation of Suspicious Activity Reports (SAR) and Currency Transaction Reports (CTR). For a more in-depth discussion of the requirements of FinCEN, see section IV(A) above.

However, as an important caveat, in order for a company to be subject to the Bank Secrecy Act, the SEC, FinCEN, or any US regulatory agency for that matter, the agency must be able to establish that it has authority over the company by demonstrating that it has substantial ties or connections to it.  Typically, this requires that company either operating physically in the United

PRIVILEGED AND CONFIDENTIAL

States, or providing or offering services to US persons. Should the Exchange operate in such a way as to avoid United States jurisdiction in its entirety, it would not be subject to these various legal and regulatory obligations.

### B. Other Federal Laws and Regulations

An exchange must register as a national securities exchange pursuant to Section 6 of the Exchange Act or fall within an exemption from such registration. The obligation to register or qualify for an exemption from registration is triggered only when a market meets the definition of exchange in the Exchange Act.

Section 3(a)(1) of the Exchange Act defines an "exchange" as:

[A]ny organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange.

Exchange Act Rule 3b-16(a) sets forth a test to evaluate whether a platform meets the above definition:

Does the organization, association, or group of persons:
(1) bring together the orders for securities of multiple buyers and sellers; and
(2) use established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.

A market that does not involve securities does not meet the definition of "exchange". Accordingly, that entity has no obligation to register as exchange with the SEC, nor meet an exemption from such registration.

Should vBit wish to operate its exchange without being required to register as such with the SEC, it would need to avoid the listing of any securities for trading. Specifically, vBit Exchange would need to perform an analysis of every asset it was considering listing to determine if same was a security prior to listing. Only after vBit was confident that the potential listing was not a security should it offer trading in that asset.

That being said, there is no guarantee that the SEC or other regulators will agree with vBit's determination that an asset is or is not a security. However, having performed the analysis before listing will show the SEC and regulators that vBit was attempting to comply with the law and may result in favorable treatment if a violation is in fact determined.

### C. State Regulations

PRIVILEGED AND CONFIDENTIAL

The operation of a for profit exchange also changes the considerations regarding state regulation. Please see the state by state review of the applicable money transmitter statutes. The review for each state contains an analysis of how a vBit Exchange would be treated under the current laws. If it is unclear whether a state would require the vBit Exchange to register, please contact us and we can discuss it further.

Also, please be advised that given the nascent nature of the virtual currency industry, and the laws that govern same, it is highly recommended that vBit Exchange confirm that the landscape of state regulation of money transmitters has not changed drastically since the issuance of this memorandum.

## VI.        Business Structure Changes

Depending on the manner in which vBit Retail, vBit Hosting, vBit Wallet, and a future vBit Exchange are structured, there may be a risk that the liabilities of one entity can be passed through to another. If you would like our firm to review the current business structure of these various entities in an effort to identify any potential problems that may arise and how to address same, please do not hesitate to reach out.