# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROSS DETTMERING, FRANCIS MANGUBAT, and all other similarly situated individuals,<br><br>   Plaintiffs,<br><br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>   Defendants, | Case No.: 22-cv-01482-JLH-SRF |
| MICHAEL EICHLER, and all other similarly situated individuals,<br><br>   Plaintiffs,<br><br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>   Defendants, | Case No.: 22-1574-CFC-SR |

# EXHIBIT E

1

## Exhibit E: Executed Employment Agreement for Chief Operating Officer Between Advanced Mining Group and Sean Tu (Effective June 15, 2022)

This exhibit is the executed Employment Agreement between Advanced Mining Group and Defendant Sean Tu for the position of Chief Operating Officer, effective June 15, 2022. The agreement establishes that Mr. Tu served as an at-will employee reporting directly to the CEO, defines his role as primarily administrative and operational in nature, and places no direct authority in his hands over sales,
marketing, customer wallets, affiliate programs, or financial systems. The agreement further contains standard confidentiality, indemnification, and limitation-of-liability provisions.

This exhibit is relevant to establish Mr. Tu's subordinate employment status, limited scope of authority, lack of enterprise-level control, and lack of decision-making power over any alleged scheme.

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is entered as of June 15th, 2022 ("Effective Date") by and between **Advanced Mining Group** ("Company"), and **Sean Tu** ("Executive")(collectively may be referred to as "Parties"; in singular form as a "Party").

WHEREAS, the Company has determined that it is in the best interest of the Company to secure the continuing services and employment of the Executive for the period provided in this Agreement and the Executive is willing to render such services on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and the Executive hereby agree as follows:

**1.      Term**

The initial term ("Initial Term") of employment under this Agreement shall commence and this Agreement shall be effective as of the Effective Date and shall continue for a period ending on the date that is one (1) calendar year from the Effective Date, unless sooner terminated in accordance with the terms hereof. The Initial Term shall be automatically extended for additional one-year periods (each such year an "Extended Term") on the same terms and conditions set forth in this Agreement, unless either party provides notice of her or its intention not to extend this Agreement at least ninety (90) days prior to the expiration of the Initial Term or, if previously extended, any Extended Term. The Initial Term and any Extended Term may be collectively referred to in this Agreement as the "Term."

**2.      At-Will Employment**

Executive and the Company agree that Executive's employment with the Company constitutes at-will employment. Executive and the Company acknowledge that this employment relationship may be terminated at any time, upon written notice to the other party, with or without good cause or for any or no cause, at the option either of the Company or Executive.

**3.      Employment Duties**

(a)     *Position*

Commencing upon the Effective Date and continuing through the period of the Executive's employment by the Company, the Executive shall serve as the Chief Operating Officer (COO) of the Company and shall have the duties, responsibilities and authority established by Chief Operating Officer (COO) including, but not limited to, the following:

> The COO reports directly to the CEO and is the second-in-command executive position within the company and responsible for the efficiency of the business. The COO oversees the day-to-day administrative and operational functions of the company. Other duties include:
>
> - Design and implement business strategies, plans and procedures
> - Set comprehensive goals for performance and growth
> - Establish policies that promote company culture and vision

- Oversee daily operations of the company and the work of executives (IT, Engineering, Marketing, Sales, Finance etc.)
- Lead employees to encourage maximum performance and dedication
- Evaluate performance by analyzing and interpreting data and metrics
- Write and submit reports to the CEO in all matters of importance
- Participate in expansion activities (technology, investments, acquisitions, corporate alliances etc.)
- Manage the organization's resources
- Manage relationships with partners/vendors

As a general requirement of the Company, each Executive and/or Employee must cooperate and assist one another with any duties and/or work that may be outside the Executive or Employee's specified job duties and responsibilities for the common goal of achieving success for the Company. The Company strongly encourages collaboration and teamwork amongst each and every personnel within the Company. Therefore, each Executive and Employee should strive towards working as a team to lend a hand and provide assistance to one another if another teammate or Executive/Employee is in need of a helping hand. The Company's success is achieved as a unified group rather than as an individual.

(b)     *Obligations*

The Executive agrees to devote his full business time and attention to the business and affairs of the Company. The foregoing, however, shall not preclude the Executive from serving on corporate, civic or charitable boards or committees or managing personal investments, so long as such activities do not interfere with the performance of the Executive's responsibilities hereunder, or leave for vacation or personal leave permitted hereunder or illness.

(c)     *Confidentiality Agreement*

i.  The Employee acknowledges that, in any position the Employee may hold, in and as a result of the Employee's employment by the Employer, the Employee will, or may, be making use of, acquiring or adding to information which is confidential to the Employer (the "Confidential Information") and the Confidential Information is the exclusive property of the Employer.

ii. The Confidential Information will include all data and information relating to the business and management of the Employer, including but not limited to, proprietary and trade secret technology and accounting records to which access is obtained by the Employee, including Work Product, Computer Software, Other Proprietary Data, Business Operations, Marketing and Development Operations, and Customer Information.

iii. The Confidential Information will also include any information that has been disclosed by a third party to the Employer and is governed by a non-disclosure agreement entered into between that third party and the Employer.

iv. The Confidential Information will not include information that:
    a. Is generally known in the industry of the Employer;

    b. Is now or subsequently becomes generally available to the public through no wrongful act

    of the Employee;

  c. Was rightfully in the possession of the Employee prior to the disclosure to the Employee by the Employer;

  d. Is independently created by the Employee without direct or indirect use of the Confidential Information; or

  e. The Employee rightfully obtains from a third party who has the right to transfer or disclose it.

v. The Confidential Information will also not include anything developed or produced by the Employee during the Employee's term of employment with the Employer, including but not limited to, any intellectual property, process, design, development, creation, research, invention, know-how, trade name, trade-mark or copyright that:

  a. Was developed without the use of equipment, supplies, facility or Confidential Information of the Employer;

  b. Was developed entirely on the Employee's own time;

  c. Does not result from any work performed by the Employee for the Employer; and

  d. Does not relate to any actual or reasonably anticipated business opportunity of the Employer.

vi. The Employee agrees that a material term of the Employee's contract with the Employer is to keep all Confidential Information absolutely confidential and protect its release from the public. The Employee agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Employee has obtained or which was disclosed to the Employee by the Employer as a result of the Employee's employment by the Employer. The Employee agrees that if there is any question as to such disclosure then the Employee will seek out senior management of the Employer prior to making any disclosure of the Employer's information that may be covered by this Agreement.

vii. The Employee agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Employer, would gravely affect the effective and successful conduct of the Employer's business and goodwill, and would be a material breach of this Agreement.

viii. The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Employee in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and will continue indefinitely from the date of such expiration or termination.



ix. The Employee may disclose any of the Confidential Information:
    a. To a third party where Employer has consented in writing to such disclosure; or

    b. To the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body after providing reasonable prior notice to the Employer.

x. If the Employee loses or makes unauthorized disclosure of any of the Confidential Information, the Employee will immediately notify the Employer and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

xi. The Employee acknowledges and agrees that all rights, title and interest in any Confidential Information will remain the exclusive property of the Employer. Accordingly, the Employee specifically agrees and acknowledges that the Employee will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trade-marks or trade names, notwithstanding the fact that the Employee may have created or contributed to the creation of the Confidential Information.

xii. The Employee waives any moral rights that the Employee may have with respect to the Confidential Information.

xiii. The Employee agrees to immediately disclose to the Employer all Confidential Information developed in whole or in part by the Employee during the Employee's term of employment with the Employer and to assign to the Employer any right, title or interest the Employee may have in the Confidential Information. The Employee agrees to execute any instruments and to do all other things reasonably requested by the Employer, both during and after the Employee's employment with the Employer, in order to vest more fully in the Employer all ownership rights in those items transferred by the Employee to the Employer.

xiv. The Employee agrees that, upon request of the Employer or upon termination or expiration, as the case may be, of this employment, the Employee will turn over to the Employer all Confidential Information belonging to the Employer, including but not limited to, all documents, plans, specifications, disks or other computer media, as well as any duplicates or backups made of that Confidential Information in whatever form or media, in the possession or control of the Employee that:

    a. May contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

    b. Is connected with or derived from the Employee's employment with the Employer.

**4.     Compensation**

(a)     *Base Salary*

During the period of the Executive's employment by the Company, the Executive shall receive an annual base salary of not less than **$300,000** ("Base Salary") payable in equal bi-weekly installments, less applicable withholdings. Each year, the CEO (or the compensation committee, if any) shall review the Base Salary and other compensation of the Executive based upon performance and other factors deemed appropriate by the CEO and make such modifications as it deems fit. For purposes of this Agreement, the term "Base Salary" shall mean the amount of the Executive's base salary established from time to time pursuant to this Section 4(a).

**5.     Benefits**

(a)     *Generally*

The Executive will be eligible to participate in accordance with the terms of all Company employee benefit plans, policies, and arrangements that are applicable to other executive officers of the Company, as such plans, policies, and arrangements may exist from time to time.

(b)     *Holidays*

The Company observes the following holidays:
- New Year Day;
- Martin Luther King;
- Memorial Day;
- Independence Day;
- Labor Day;
- Columbus Day;
- Veterans Day;
- Thanksgiving Day;
- Christmas Day;

**6.     Termination of Employment**

(a)     *Death*

The Executive's employment hereunder shall terminate upon the Executive's death.

(b)     *Disability*

Either the Executive or the Company shall be entitled to terminate the Executive's employment for "Disability" by giving the other party a Notice of Termination (as defined below). For purposes of this Agreement, "Disability" shall mean (i) the Executive has, as determined by a doctor selected by the Executive and acceptable to the Company (such acceptance not to be unreasonably withheld), suffered a physical or mental illness or injury that has impaired the Executive's ability to substantially perform the Executive's full-time duties with the Company, with or without reasonable accommodation, for a period of

one-hundred eighty (180) consecutive days, and (ii) the Executive has not substantially returned to full time employment before the Termination Date (as defined below) specified in the Notice of Termination.

(c)     *Cause*

The Company shall be entitled to terminate the Executive's employment for Cause by giving the Executive a Notice of Termination. For purposes of this Agreement, "<u>Cause</u>" shall mean: (i) the Executive's misappropriation or theft of the Company's or any of its subsidiary's funds or property, (ii) the Executive's conviction or entering of a plea of *nolo contendere* of any fraud, misappropriation, embezzlement or similar act, felony or crime involving dishonesty or moral turpitude, (iii) the Executive's material breach of this Agreement or failure to perform any of his duties owed to the Company, (iv) the Executive's commission of any act involving willful malfeasance or gross negligence or the Executive's failure to act involving material nonfeasance or (v) a material violation by the Executive of the code of conduct of the Company or its subsidiaries (i.e., policies and guidelines in the Employee Handbook) (to the extent such code of conduct has been provided to or made available to the Executive) or of any statutory or common law duty of loyalty to the Company or its subsidiaries.

The Executive's employment with the Company shall not be terminated for Cause unless he has been given written notice by the Company of its intention to so terminate his employment (a "<u>Notice of Cause</u>"), such notice (i) to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination for Cause is based and (ii) to be given within six months of the Company's learning of such acts or failures to act. The Executive shall have 10 days after the date that the Notice of Cause is given in which to cure any breach of this Agreement or acts or failures to act, to the extent such cure is possible.

(d)     *Without Cause*

The Company may terminate the Executive's employment hereunder, without Cause, at any time and for any reason or for no reason by giving the Executive a Notice of Termination (as defined below).

(e)     *Voluntary Resignation*

The Executive may resign from his employment hereunder at any time and for any reason by giving the Company a Notice of Resignation (as defined below).

(f)     *Notice of Termination/Resignation*

For purposes of this Agreement, a "<u>Notice of Termination/Resignation</u>" shall mean a notice which indicates the specific termination provision in this Agreement relied upon and which sets forth in reasonable detail, if applicable, the facts and circumstances claimed to provide a basis (unless not required pursuant to <u>Section 6(d)</u>) for termination of the Executive's employment under the provision so indicated. To avoid any ambiguity, "Notice of Termination" refers to the Notice when the Executive's employment with the Company is terminated by the Company whereas "Notice of Resignation" refers to the Notice when the Executive voluntarily resigns from his employment with the Company. The Termination/Resignation Date (as defined below) specified in such Notice of Termination/Resignation shall be no less than two weeks from the date the Notice of Termination/Resignation is given; provided, however, that (i) if the Executive's employment is terminated by the Company due to Disability, the date specified in the Notice of Termination

shall be at least thirty (30) days (but not more than ninety (90) days) from the date the Notice of Termination is given to the Executive and (ii) if the Executive terminates or resigns his employment in accordance with Section 6(e) of this Agreement, the date specified in the Notice of Termination/Resignation shall be at least thirty (30) days from the date the Notice of Termination/Resignation is given to the Company.

(g)     *Termination/Resignation Date*

"Termination/Resignation Date" shall mean the date of the termination or resignation of the Executive's employment with the Company and specifically (i) in the case of the Executive's death, his date of death; (ii) in the case of the expiration of the Term of this Agreement in accordance with Section 1, the date of such expiration; and (iii) in all other cases, the date specified in the Notice of Termination/Resignation, as defined in Section 6(f).

**7.     Compensation Upon Termination/Resignation of Employment**

(a)     *Compensation*

If during the Term of this Agreement, the Executive's employment under this Agreement is terminated (i) by the Company for Cause or (ii) if the Executive resigns, the Company's sole obligation hereunder shall be to pay the Executive the following amounts earned, accrued or owing hereunder but not paid as of the Termination/Resignation Date (collectively, "Accrued Compensation"):

(i)     Base Salary unpaid through the Termination Date;
(ii)    Reimbursement of any and all reasonable expenses incurred in connection with the Executive's duties and responsibilities under this Agreement in accordance with policies established by the Company from time to time and upon receipt of appropriate documentation; and other or additional benefits and entitlements in accordance with applicable plans, programs and arrangements of the Company.

The Accrued Compensation shall be paid in a single lump-sum cash payment within ten (10) days following the Executive's Termination/Resignation Date, except that any portion thereof required to be paid sooner under applicable law shall be paid by the applicable deadline. The Executive shall not be entitled to any other payment after payment in full of the Accrued Compensation, other than any payment required under any indemnification obligation of the Company and employee benefits to which the Executive is entitled under COBRA (as defined in Section 7(d)), which obligations shall survive termination (collectively, "Post-Termination Obligations").

(b)     *Disability*

If the Executive's employment hereunder is terminated by either party by reason of the Executive's Disability, the Company's shall pay the Executive the unpaid Accrued Compensation through the Termination Date within thirty (30) days following the Executive's Termination Date, except that any portion thereof required to be paid sooner under applicable law shall be paid by the applicable deadline.

(c)     *Termination by Company without Cause*

If during the Term of this Agreement, the Executive's employment is terminated by the Company without



Cause pursuant to Section 6(c), the Company's shall pay the Executive the following amounts:

    (i)    Accrued Compensation;
    (ii)    The Post-Termination Obligations.

The Accrued Compensation shall be paid in a single lump-sum cash payment within thirty (30) days following the Executive's Termination Date, except that any portion thereof required to be paid sooner under applicable law shall be paid by the applicable deadline.

(d)    *Continuation of Employee Benefits*

The Company shall, at its expense, provide to the Executive continued participation in all medical insurance coverages in which the Executive was participating immediately prior to the Termination Date, for a period of eighteen (18) months following the Termination Date, if the Executive's employment is terminated by the Company other than for Cause; provided that, if the continued participation would reasonably give rise to any fines, penalties, or negative tax consequences to the Company or the Executive (including without limitation, under the Patient Protection and Affordable Care Act), as determined by the Company in good faith, the Company may discontinue the extension of the foregoing coverages. In each case, benefits required pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), to the extent that is applicable to Company under the applicable state and federal laws, will commence after the applicable period has been completed. Notwithstanding the foregoing, the Company's obligation under this Subsection 7(e) shall be reduced, or entirely terminated, to the extent that equivalent coverages and benefits (determined on a coverage-by-coverage and benefit-by-benefit basis) are provided under the plans, programs or arrangements of a subsequent employer.

**8.**    **Conditions to Receipt of Severance**

(a)    *Non-Disparagement*

During the Employment Term and for the twelve (12) months thereafter, the Executive will not knowingly disparage, criticize, or otherwise make any derogatory statements regarding the Company, its directors, or its officers.

(b)    *Other Requirements*

The Executive's receipt of continued employee benefits post-termination of employment will be subject to the Executive continuing to comply with the terms of the Confidentiality Agreement attached hereto as Exhibit "A".

**9.**    **Indemnification**

Subject to applicable law, the Executive will be provided indemnification to the maximum extent permitted by the Company's bylaws and Certificate of Incorporation, including, if applicable, any director's and officer's insurance policies, with such indemnification to be on terms determined by the Company or any of its committees.


**10.**     <u>Notices</u>

All notices, requests, demands, and other communications called for hereunder will be in writing and will be deemed given: (a) on the date of delivery if delivered personally; (b) one (1) day after being sent overnight by a well-established commercial overnight service; or (c) five (5) days after being mailed by registered or certified mail, return receipt requested, prepaid and addressed to the parties or their successors at the following addresses, or at such other addresses as the parties may later designate in writing:

If to the Company:

> Attn: Lillian Zhou, CEO
> Advanced Mining Group.
> 1625 Washington Ave,
> Philadelphia, PA 19146
> Email: l.zhou@vbittech.com

If to Executive:

> Sean Tu
> 1390 Braun Ct
> Eagan, MN 55123
> Phone: 612-888-0068
> Email: saj.tu@outlook.com

**11.**     <u>Severability</u>

If any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, this Agreement will continue in full force and effect without said provision.

**12.**     <u>Arbitration</u>

The Parties agree that any and all disputes arising out of the terms of this Agreement, Executive's employment by the Company, Executive's service as an officer or director of the Company, or Executive's compensation and benefits, their interpretation, and any of the matters herein released, will be subject to binding arbitration in Philadelphia, Pennsylvania before the Judicial Arbitration and Mediation Services, Inc. (JAMS) under the American Arbitration Associations National Rules for the Resolution of Employment Disputes, supplemented by the Pennsylvania Rules of Civil Procedure. The Parties agree that the prevailing party in any arbitration will be entitled to injunctive relief in any court of competent jurisdiction to enforce the arbitration award. The Parties hereby agree to waive their right to have any dispute between them resolved in a court of law by a judge or jury. This paragraph will not prevent either party from seeking injunctive relief (or any other provisional remedy) from any court having jurisdiction over the Parties and the subject matter of their dispute relating to Executive's obligations under this Agreement and the Confidentiality Agreement.  Any Party that commences action in court without first submitting the dispute to arbitration shall forfeit its entitlement to recover attorney's fees, even if that Party ultimately prevails in court.

<u>**BINDING ARBITRATION**</u>**:** THE PARTIES ACKNOWLEDGE THAT "BINDING ARBITRATION"



MEANS THE PARTIES WILL BE CONTRACTUALLY OBLIGATED TO ACCEPT ANY AWARD ISSUED BY THE ARBITRATOR AS **FINAL** AND, THEREBY, WAIVE THEIR RIGHT TO SEEK REDRESS IN COURT, WAIVE THEIR RIGHT TO TRIAL BEFORE A JURY AND WAIVE THEIR RIGHT TO APPEAL FROM THE ARBITRATOR'S AWARD.

Each Party shall bear its own fees and costs for the arbitration which shall be recoverable by the prevailing party. In any arbitration arising out of or related to this Agreement, the arbitrator is not empowered to award punitive or exemplary damages and shall adhere to the express limitations on liability mutually agreed upon in Section 21 of this Agreement.

**13.    Integration, Amendment, and Entire Agreement**

This Agreement, together with the Confidentiality Agreement (Exhibit "A"), represents the entire agreement and understanding between the Parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. No waiver, alteration, or modification of any of the provisions of this Agreement will be binding unless in a writing and is signed by duly authorized representatives of the Parties hereto. In entering into this Agreement, no party has relied on or made any representation, warranty, inducement, promise, or understanding that is not in this Agreement. The Executive acknowledges that Executive is not subject to any contract, obligation or understanding (whether written or not) that would in any way restrict the performance of Executive's duties as set forth in this Agreement.

**14.    Waiver of Breach**

The waiver of a breach of any term or provision of this Agreement, which must be in writing, will not operate as or be construed to be a waiver of any other previous or subsequent breach of this Agreement.

**15.    Survival**

The Confidentiality Agreement will survive the termination of this Agreement.

**16.    Headings**

The headings of sections are included solely for convenience of reference and shall not control the meaning or interpretation of any of the provisions of this Agreement.

**17.    Tax Withholdings**

All payments made pursuant to this Agreement will be subject to withholding of applicable taxes.

**18.    Governing Law and Venue**

This Agreement will be governed by the laws of the State of Pennsylvania. In the event of any controversy or claim between the Company or any of its affiliates and the Executive arising out of or relating to this Agreement that is not settled by mutual agreement or arbitration pursuant to Section 12, such controversy or claim (only to the extent arbitration is not required pursuant to Section 12) shall be determined in a court of competent jurisdiction in Philadelphia, Pennsylvania, or the federal court for Philadelphia, Pennsylvania,



and each party waives any claim to have the matter heard in any other local, state, or federal jurisdiction.

**19.     Attorneys' Fees**

In the event of any action for the breach of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and expenses incurred in connection with such action.

**20.     Advice of Counsel and Interpretation of the Agreement**

Each Party to this Agreement and its legal counsel have reviewed this Agreement and/or had the opportunity to do so.  The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits/attachments to this Agreement.  This Agreement shall not be deemed prepared or drafted by one Party or another, or its attorneys, and will be construed accordingly.

**21.     Limitation on Liability**

**THE COMPANY'S LIABILITY TO EXECUTIVE WHETHER BASED ON CONTRACT, TORT, WARRANTY, OR ANY OTHER THEORY, SHALL NOT EXCEED THE BASE SALARY OF THE EXECUTIVE AS SPECIFIED IN SECTION 4(a) OF THIS AGREEMENT.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR PUNITIVE, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**22.     Voluntary Agreement**

The Parties expressly declare and represent that they have respectively read and understood the meaning of the terms and conditions contained in this Agreement, and that they have had the opportunity to consult with legal counsel (and that Employee has been advised to consult with legal counsel) prior to executing this Agreement.  The Parties further declare and represent that they each fully understand the content and effect of this Agreement and that they respectively approve and accept the terms and conditions contained herein, and that this Agreement is executed freely and voluntarily without coercion.

**23.     Counterparts**

This Agreement may be executed in counterparts, including facsimile, PDF or other electronic copies, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned.

[*signature page to follow*]



IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by a duly authorized officer, as of the day and year written below.

| Advanced Mining Group | Sean Tu |
|---|---|
| By: <u>Lillian Zhou</u> | Signature:_____ |
| Its: ____<u>CEO</u>____ | Date: _____ |
| Signature: _____ | |
| Date: _____ | |