# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROSS DETTMERING, FRANCIS MANGUBAT, and all other similarly situated individuals,<br><br>        Plaintiffs,<br><br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>        Defendants, | Case No.: 22-cv-01482-JLH-SRF |
| MICHAEL EICHLER, and all other similarly situated individuals,<br><br>        Plaintiffs,<br><br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>        Defendants, | Case No.: 22-1574-CFC-SR |

# EXHIBIT M

## Exhibit M: Deposition Excerpts of Michael Eichler (August 28, 2025)

This exhibit contains selected excerpts from the sworn deposition of Plaintiff **Michael Eichler** ("Eichler", "Mr. Eichler", or "The Witness"). These excerpts support Defendant Sean Tu's ("Mr. Tu"). Motion for Summary Judgment because they show that Eichler has no personal knowledge of Mr. Tu's role, never met or communicated with Tu, Gao, or Vo, and relied solely on an unverified social-media article he cannot identify. Eichler admits he has no firsthand knowledge of what any individual defendant did, acknowledges that his roommate—not any defendant—referred or sold him the VBit packages, and confirms he freely withdrew Bitcoin earnings prior to 2022. He further testifies that he cannot identify who caused his alleged losses, agrees that individuals should not be sued unless they personally engaged in wrongdoing, and concedes that the First Amended Complaint improperly lumps all defendants together without any factual basis tying Mr. Tu to the alleged conduct. These admissions demonstrate that Eichler has no evidence of any actionable conduct by Mr. Tu.

### I. Eichler Admits He Has No Personal Knowledge About Sean Tu or Any Defendant, and Only Recognizes Tu's Name From Articles.

**Pages 87:5-25, 88:1-25, 89:1-25, 90:1**  (Examination by Mr. Kim)

Q. Now you don't know what positions were, if

any, that any of these individuals held with VBit

Technologies Corporation, correct?

A. Correct. I don't know their positions.

Q. Let alone their relationship with VBit

Technologies Corporation, correct?

A. Correct.

Q. In fact, you don't even know if they're

indeed employees of VBit Technologies Corporation,

correct?

A. I don't know for sure. I would imagine

they are, if they're in this case, but I don't know

for sure.

Q. You're just basing it because they're

listed here as defendants, correct?

A. Correct.

Q. You don't have any independent knowledge

of what they do, or what they did for

VBit Technologies, correct?

A. Correct.

Q. And you don't know if they have any

relationships with a company called VBit Mining LLC,

correct?

A. Correct.

Q. And you don't know if any of these

individuals had any type of relationship with

Advanced Mining Group; is that correct?

A. Correct.

Q. So it's fair to say that these individuals

could have not been employees with any of these

entities that are named; is that correct?

A. It's unlikely but possible.

Q. It's unlikely but possible. But your

reliance of why they're involved in this lawsuit is

just because they're named in this lawsuit; is that

correct?

A. Correct.

Q. You have no other independent knowledge or

3

understanding as to why these individuals are named

as defendants, correct?

A. Correct.

Q. Have you heard of the name Sean Tu before?

A. Rings a bell, yes.

Q. How does it ring a bell?

A. I have seen his name a couple of times in

the lawsuit articles, and, likely, a couple news

articles.

Q. So aside from this lawsuit, and aside from

this document that has been marked as Exhibit 8,

have you ever seen his name before?

A. In a news article, yes.

Q. Not in -- not related to the lawsuit?

A. Related to VBit, but not necessarily this

particular lawsuit.

Q. What kind of article are you talking

about?

A. It would have been -- I don't know the

exact publication, but it would have been somewhere

along the lines of VBit Ponzi scheme scam.

Q. So is that in relation to the lawsuit,

that article?

A. Not this particular lawsuit, but VBit

company as a whole.

Q. So what do you recall seeing Sean Tu's

name affiliated with in that article?

A. I believe the owner or a high-up, you

know, position in the company.

Q. And that's based on your recollection of

reviewing that article?

A. Yes.

Q. And what else do you recall about Sean Tu?

A. Nothing much further than that.


**Pages 149:16-25, 150:1-25, 151:1-2**  (Examination by Mr. Tu)

Q. At the time of your first purchase with

VBit, did you know -- did you know who I was?

A. I did not.

Q. Now, just to confirm, you said earlier

that you only became aware of me and my connection

through a news article, correct?

A. Correct.

Q. Did you save a copy of that article?

A. I did not.

Q. So did you send or share the link to the

article to anyone, or to your lawyer?

A. Did not.

Q. Okay. Before, or at the time of your

purchase, did you knew if I was either a founder, an

owner, a shareholder -- a major shareholder of any

of the VBit entities?

A. I was not sure of your connection, no.

Q. Did I ever contact you, speak with you, or

ask you to invest in VBit?

A. Directly, no.

Q. Did you have any emails, text messages

from me or -- where I promised or gave any advice?

A. I did not.

Q. Do you have any idea what I did at VBit?

A. I'm not sure specifically what you did,

no.

Q. Can you name anything that I did that

caused you to lose money?

A. Not specifically, no.

Q. Can you describe any action I took on my

own, as individual, personally, that would make me

responsible for your loss?

A. I'm not sure, no.

Q. Do you have any facts that prove that I

personally caused any of the harm that you specified

in this complaint, or this case?

A. Not specifically, no.


**II. Eichler Has No Personal Knowledge About the Answering Defendants—Tu, Gao, or Vo—Never Had Any Contact With Them, and Bases His Beliefs Solely on an Unverified Article.**

**Pages 90:2-25, 91:1-25, 92:1-25, 93:1-25, 94:1-9**  (Examination by Mr. Kim)

Q. How about Jin Gao?

A. Similar to Sean.

Q. What is that? Can you be more specific?

A. That he held some sort of high-up position

in VBit.

Q. And your information comes from solely

that article; is that correct?

A. Correct.

Q. Nothing else, correct?

A. I don't believe so, no.

Q. And do you know a person by the name of
Phuong Vo?

A. I don't know them personally, no.

Q. Did you ever hear about that person's name
before?

A. I believe so, similar to the other two.

Q. How? Through the article?

A. Yes, that they held some sort of position
in VBit.

Q. And you're relying entirely on that
article, correct?

A. Correct.

Q. And what did that article say about
Phuong Vo?

A. I don't recall exactly what it said.

Q. Go ahead.

A. I don't recall anything specific about
them specifically.

Q. Is Phuong Vo even a male or a female, do
you know?

A. I don't know.

Q. Have you ever met any of these individuals
that are named here?

A. I have not.

Q. And do you know if any of these names are indeed their legal name even?

A. I would imagine so if they're listed as that, but I'm not sure.

Q. When was the last time you read that article?

A. It's been a while, I would imagine.

Q. And who published that article?

A. I can't remember.

Q. Do you recall where you saw that article?

A. It would have been on some sort of social media.

Q. What social media?

A. I don't recall.

Q. Could that have been Facebook?

A. Possibly.

Q. X, or Twitter?

A. Possibly.

Q. Do you know the author who wrote that article?

A. Do not.

Q. Have you verified the sources of that article?

A. I did maybe at the time, but currently I don't remember.

Q. Did you or did you not? Do you recall having done so, or no?

A. I don't remember, no.

Q. So you may not have done independent

source check of that article, correct?

A. It's possible.

Q. And had you actually done an independent

search of that source of that article what would you

have done?

A. I would look up -- I'm sure there was

multiple articles. So I would just look up similar,

and then look for ones publicized by verified news

sources like CNN, or ABC, or anything similar to

that.

Q. And do you believe that those verified

sources, as you call them, covered that story that

you read in that article?

A. I don't remember, but it's likely.

Q. You don't remember but it's likely; is

that your testimony?

A. Correct.

Q. I just want to be clear. Do you agree

with each of the factual -- I'm not talking about

the law, okay? You're not a lawyer; I'm not

expecting you to understand the law. I'm talking

about only the facts, okay? The facts as they're

alleged in this document that's been marked in

Exhibit 8, you're saying that you agree to every

single one; is that correct?

ATTORNEY NAGDEMAN: I'm going to

object just to the extent that -- I know you

prefaced this with not a legal conclusion, but

these are theories of the case. Mr. Eichler is

obviously entitled to --

ATTORNEY KIM: David, just make a

form objection, and let's move on. It's not a

speaking objection. Reserve your objection and

move on. All right?

Q. (By Attorney Kim) Mr. Eichler, going

back, just your understanding of the facts as

alleged in this document that is marked as Exhibit

8, you agree with every single one; is that correct?

A. Yes.

Q. But you have zero personal knowledge of

any of these facts; is that correct?

A. Correct.

Q. But you're just saying that you agree with

them just because they're in this complaint; is that

correct?


### III. Prior to June 2022, Mr Eichler was able to freely access his bitcoins in his VBit Digital Wallet.

**Pages 69:4-25, 70:1-25, 71:1-25, 72:1-9**  (Examination by Mr. Kim)

Q. So in between those two months, you said

that you did generate some revenue from VBit,

correct?

A. Correct.

Q. In total, how much in revenue did you

generate from VBit's mining?

A. I don't know the exact number, but it was
around, like, 4,000 ish USD.

Q. Did you ever withdraw any Bitcoin from
VBit's wallet?

A. It was about that 4,000. I had earned, I
believe, a little bit more than that, but I
withdrawed (phonetic) around 4,000.

Q. When did you withdraw that money?

A. I don't know the exact date, but it would
have been probably a couple months after the miners
started to operate.

Q. And what process did you take to withdraw
that money from VBit?

A. I went through their online portal and had
it sent to Bitcoin wallet.

Q. Can you be more specific in terms of what
you did? What do you mean by wallet and all -- can
you be more specific, please?

A. Okay. On VBit's website, they have their
own custodian wallet, similar to how Coinbase does
it, where they will hold your Bitcoin for you in
what's called a cryptocurrency wallet. And from
there, you can make transfers to other
cryptocurrency wallets, and that's what I did.

Q. And when you withdraw from the wallet that
is maintained by VBit, do you have to make a request
to VBit directly, or can you just do that
transaction by yourself?

11

A. You make a request.

Q. Who do you make that request to?

A. I would imagine whoever on the VBit team

handles transfers.

Q. You don't know who that is, correct?

A. No. I did it through, like, the system,

the wallet they had on the website.

Q. So when you say you did it through "the

system, the wallet that they had on the website,"

did that include sending an email to any particular

person at VBit?

A. I don't believe so, no. You can go on

the -- where the custodian wallet was, type in the

amount of Bitcoin or the USD amount you wanted to

transfer, and then which wallet you wanted to

transfer to, and you wound click, essentially,

"submit." And then they would, I guess, process it

in the background and send it over to you.

Q. So is it true that you don't necessarily

have to contact or communicate with a VBit personnel

to withdraw funds from your VBit wallet?

A. That sounds correct.

Q. How many times would you say you withdrew

funds from the VBit wallet?

A. I can't remember, maybe a couple.

Q. Is it more than four times?

A. I don't believe more than four, no.

Q. Is it less than three?

A. I can't remember, but probably around two

or three maybe.

Q. But each time when you withdrew, you did

it within the system itself; you didn't have to go

through or contact someone at VBit to do that,

correct?

A. I believe that's correct, yes.

Q. And why did you withdraw that money from

VBit's wallet at that time that you did?

A. Because those were my earnings.

Q. And when was the most recent time that you

withdrew that money?

A. I can't remember.

Q. Was that in 2022?

A. Likely 2022; yeah, probably early 2022.

Q. Do you recall if that was in May of 2022?

A. I don't recall; but that is possible, yes.

Q. Could it have even been in June of 2022?

A. It's possible.


**Pages 95:18-25, 96:1-25, 97:1-24**  (Examination by Mr. Kim)

Q. Great. I just have a few more questions,

Mr. Eichler. And again, I'll let you go, at least

from my end.

You testified earlier that you did

generate some revenue from VBit's packages; do you

recall that?

A. Correct.

Q. Do you have any documents where you may have

have memorialized the amount in which you may have

generated revenue from VBit's packages?

A. I likely have emails, like, confirmation

emails from VBit, if I looked.

Q. When you say "confirmation emails," what

do you mean by that?

A. Like confirmation of withdrawals, I would

imagine.

Q. All right. So you would have those

emails -- whenever you would withdraw funds from

VBit's wallet or VBit's system, you would receive an

email confirming your withdrawal, correct?

A. Yeah.

Q. And again, you didn't provide that to your

counsel yet; did you?

A. I did not.

Q. Can you look through those and give it to

your counsel when you can find them?

A. Yes.

Q. And you mentioned -- just to clarify, you

mentioned earlier that you were able to withdraw

about $4,000 in USD; is that correct?

A. Yeah, around $4,000.

Q. Is that the total sum that you mentioned,

or is that just a one-time withdrawal of $4,000?

A. That would be the total of a couple

different withdrawals.

Q. So multiple withdrawing sessions, or

requests, or withdrawals that totaled up to 4,000;

is that correct?

A. Correct.

Q. And when you withdrew them, did you put it

in another account, or did you just use the dollars,

the USD dollars?

A. I moved it to another Bitcoin wallet that

I own, yes.

Q. And what Bitcoin wallet did you move it

to?

A. It would have been probably my Coinbase

address.

Q. Do you recall how much, in total, Bitcoin

you had in your VBit wallet before it got frozen?

A. I don't know the exact number, no.

Q. Can you give me an approximate value?

A. I'm not sure. I'm not either.

Q. Is it more than one?

A. More than one Bitcoin? No.

Q. Less than one?

A. Less than one Bitcoin, yes.


**Pages 98:21-25, 99:1-23** (Examination by Mr. Kim)

Q. And were you able to connect your VBit

wallet with your Coinbase wallet at any time?

A. What do you mean "connect"?

Q. So were you able to transfer whatever was

15

in VBit's wallet to Coinbase wallet using VBit's

system?

A. At the beginning, yes.

Q. When you say "at the beginning," what you

do you mean?

A. Before the funds were frozen, yes.

Q. So you were able to transfer directly from

VBit's system to Coinbase's system; is that correct?

A. Correct.

Q. You didn't require a middleman or middle

programmer or company to make that transfer; is that

correct?

A. Yeah. I believe that VBit had to confirm,

because they weren't instant. So I believe that

there was a middleman in that, yes.

Q. So who was that middleman, as you

understand it to be?

A. It would be VBit.

Q. Right. But outside of VBit and say, for

example, Coinbase, there wouldn't be a third company

or a vendor that operates or processes that

transfer, correct?

A. Correct. That's not necessarily how

cryptocurrency works.

**IV. Eichler Admits He Cannot Identify Who "Ruined Lives" or Caused His Alleged Damages.**

**Pages 99:24-25, 100:1-10**  (Examination by Mr. Kim)

Q. Just one last question. What are you

trying to accomplish from this lawsuit?

A. To at least get these guys in trouble,

that they, you know, ruined a lot of peoples' lives

stealing a lot of money from them, and I would hope

to at least get back some or all of the portion of

the money I spent on this Ponzi scheme.

Q. Just following up on that. When you say

"these guys in trouble," you don't know who these

guys are in fact that did these horrible things that

you mention, correct?

A. Correct.

**V. Eichler Knew VBit Used a Multilevel Marketing Structure and Had No Objection at the Time of Purchase.**

**Page 104:12-24**  (Examination by Mr. Ratchick)

Q. At the time that you bought the two

packages in October and December of 2021, did you

have any concerns or problems with participating

with a company that had a multilevel marketing

structure?

A. I did not.

Q. So inherently you were not -- you don't

find a problem with a multilevel marketing structure

17

associated with VBit and/or Advanced Mining,

correct?

A. I don't find a problem with a multilevel

marketing in general; however, there are some cases

where I might.


**Page 106:19-25**  (Examination by Mr. Ratchick)

Q. Did any of your roommates -- you indicated

a Mr. Dempsey and possibly one or two others -- did

they participate in the affiliate program?

A. Yes, I believe so.

Q. And did they have any operational role in

VBit or Advanced Mining?

A. No operational role, no.


**VI. Eichler Admits His Roommate, Not Any Defendant, Referred or "Sold" Him the VBit Packages, and He Has No Independent Basis for Naming the Individual Defendants.**

**Pages 108:4-25, 109:1-25, 110:1-3**  (Examination by Mr. Ratchick)

Q. Who sold you your package, or who got

credit, or commission credit, for selling or

recommended you to purchase your package?

A. It would have been my roommate, Jonathan

Dempsey.

Q. You haven't named him has a defendant in

the case; have you?

A. I don't believe so, no.

Q. Why not?

A. I don't know. I didn't think I

necessarily needed to.

Q. He's the one that recommended that you get

involved, right?

ATTORNEY NAGDEMAN: Objection. Calls

for legal conclusions here.

ATTORNEY RATCHICK: That was a

factual question, but the objection is noted.

THE WITNESS: I wouldn't say he

recommended that I get involved. He just was

someone who I used the referral code for. It

was my decision entirely to purchase.

Q. (By Attorney Ratchick) Did any of the

individual named defendants recommend that you get

involved in purchasing mining packages through VBit?

A. No, they did not.

Q. Why did you name them as defendants?

ATTORNEY NAGDEMAN: Calls for legal

conclusion.

ATTORNEY RATCHICK: He's the named

plaintiff. I can ask him if I want to.

ATTORNEY NAGDEMAN: Go for it.

Q. (By Attorney Ratchick) You can answer.

A. Because I believe to be that they're part

of the company in an operation role.

Q. Okay. And what is the basis for that

belief?

ATTORNEY NAGDEMAN: I instruct you

not to answer to the extent that anything you

say is something that your attorneys spoke to

you about.

Q. (By Attorney Ratchick) Do you have any

independent knowledge to answer that question, other

than what your attorneys told you?

A. No.

Q. So as you sit here today, and at any time

prior to today, you have no firsthand, personal

knowledge of what any of the named individual

defendants did or didn't do with regard to VBit

and/or Advanced Mining; is that correct?

A. Correct.


**VII. Eichler Admits He Has No Firsthand Knowledge of Anything the Individual Defendants Did and Named Them Based Only on Assumptions.**

**Pages 108:25, 109:1-25, 110:1-3**  (Examination by Mr. Ratchick)

Q. (By Attorney Ratchick) Did any of the

individual named defendants recommend that you get

involved in purchasing mining packages through VBit?

A. No, they did not.

Q. Why did you name them as defendants?

ATTORNEY NAGDEMAN: Calls for legal

conclusion.

ATTORNEY RATCHICK: He's the named

plaintiff. I can ask him if I want to.

ATTORNEY NAGDEMAN: Go for it.

Q. (By Attorney Ratchick) You can answer.

A. Because I believe to be that they're part

20

of the company in an operation role.

Q. Okay. And what is the basis for that

belief?

ATTORNEY NAGDEMAN: I instruct you

not to answer to the extent that anything you

say is something that your attorneys spoke to

you about.

Q. (By Attorney Ratchick) Do you have any

independent knowledge to answer that question, other

than what your attorneys told you?

A. No.

Q. So as you sit here today, and at any time

prior to today, you have no firsthand, personal

knowledge of what any of the named individual

defendants did or didn't do with regard to VBit

and/or Advanced Mining; is that correct?

A. Correct.


**VIII. No knowledge of VBit Employees, no communication with anyone from VBit.**

**Page 30:4-22**  (Examination by Mr. Kim)

Q. Did you at any time -- again, at any time,

know the total number of employees at VBit

Technologies Corporation?

A. No, I did not, and do not.

Q. And did you at my time know the job titles

of any of the employees at VBit Technologies

Corporation?

A. No, I do not.

Q. Did you at any time know the job

functions, or the specific job duties, of any of the

employees at VBit Technologies Corporation?

A. No, I do not.

Q. At any time, did you know any of the names

of any of the employees at VBit Technologies

Corporation?

A. No, I did not.

Q. Did you at any time communicate with

anyone from VBit Technologies Corporation?

A. No, I did not.


**IX. Eichler Admits Individuals Should Not Be Sued Unless They Personally Committed Wrongdoing.**

**Pages 151:3-25, 152:1-15**  (Examination by Mr. Tu)

Q. When you made your first -- or came to

know about VBit, or made your first purchase,

whichever comes earlier, did you know what kind of

company it was, like an LLC or a corporation?

A. I'm not sure the corporate structure, no.

Q. Do you know, for LLCs and corporations,

that if -- employees are personally liable for

business actions?

ATTORNEY NAGDEMAN: Calls for legal

conclusion. Objection. You can answer if you

know.

THE WITNESS: I'm not sure.

Q. (By Mr. Tu) Do you think employees or

contractors would be responsible for what other

people did at a company?

ATTORNEY NAGDEMAN: Same objection.

THE WITNESS: Not sure.

Q. (By Mr. Tu) Do you think any employee

should be blamed for what the company does as a

whole?

A. Depends on what they did, I believe.

Q. So Mr. Eichler, you said earlier you work

in real estate, correct?

A. That's correct.

Q. You work for a real estate company?

A. As an independent contractor, yes.

Q. So if that company were ever sued in a

class action over how it handles things like

commissions, do you think that you personally, as an

independent contractor, should be named in that

lawsuit?

ATTORNEY NAGDEMAN: Objection.

Speculative. Legal conclusions. Vague.

THE WITNESS: Depends if I was the

one who did the wrongdoing.

Q. (By Mr. Tu) So let's assume you didn't do

any wrongdoing.

A. Then no.

**X. Eichler Admits the Complaint Improperly Lumps All Defendants Together and He Has No Facts Supporting Any Allegation Against the Individual Defendant.**

**Pages 153:3-25, 154:1-25, 155:1-25, 156:1-15**  (Examination by Mr. Tu)

Q. So just to confirm, earlier you said you

read the complaint, and the first amended complaint,

correct?

A. Correct.

Q. So I like to call the first amended

complaint as just FAC. So I'll refer to that as FAC

going forward. Do you understand what the term

"frivolous claims" mean?

A. No. Could you define that?

Q. Frivolous claims, I think, are claims made

that are baseless and has no facts behind it.

A. Okay.

Q. So --

MR. TU: And, Mitch, would you be

able to bring up you the first amended

complaint, if you can share it again?

ATTORNEY KIM: Sure.

Q. (By Mr. Tu) So can you show the first

paragraph?

So in the first paragraph right after the

plaintiffs are defined, like, it says, Ross

Dettmering, Francis Mangubat, grouped together in,

quotes, Plaintiffs -- so Plaintiffs are defined as

Ross Dettmering -- and then similarly (phonetic),

they define Defendants. So they define the

24

entitities, VBit Tech; VBit Mining; Advanced Mining;

and then all the individuals, Don Vo, Phuong Vo,

myself, and Jin Gao, together defined as,

quote/unquote, Defendants.

   Do you see that?

A. Yes, I do.

Q. Do you understand that that has defined,

going forward, "the Defendants," whenever we see

that in the complaint, means all these -- means

everybody there.

A. Correct.

Q. So I may use a short term, "group

Defendants" or "lump Defendants," like, lumped

together. So there are at least 38 complaints in

here, at least 38, that are made against the group

that was defined as Defendants. I can --

ATTORNEY KIM: Objection.

Foundation. Document speaks for itself.

MR. TU: Yeah, there's 38. So --

ATTORNEY RATCHICK: He hasn't even

asked a question yet.

Q. (By Mr. Tu) Are you aware that -- among

these group complaints alleged that the Defendants

as that group participated in sales, marketing or

made certain representations or contract or

obligations?

A. Can you repeat that question?

Q. So in this whole document, those 38

complaints all together, has alleged that the group

defendants, everybody in that group, participated in

sales, marketing, and made representation to you?

A. Correct.

Q. Do you have -- so therefore, do you have

any facts or evidence that I, as part of this group

that was -- that has been alleged to do sales,

marketing, et cetera, that I personally made any

pitches to you?

A. I do not.

Q. Since you don't have any factual evidence

against that, would you think that matches the term

"frivolous claims"?

ATTORNEY NAGDEMAN: Objection. Calls

for legal conclusion. Attempt to badger the

witness.

MR. TU: I don't think I'm badgering.

I'm not a lawyer. So I'm sorry.

ATTORNEY NAGDEMAN: You can answer.

THE WITNESS: I don't know.

Q. (By Mr. Tu) So just to be clear, even

though the complaint includes allegation against the

Defendants as a group, including me, that

participate in sales, marketing, you have no

personal knowledge that I, individual, or any other

individuals, any of the other answering defendants,

have done any of that, right?

A. Correct.

26

Q. Okay. Since this case started, have you

reviewed anything from your side, like documents,

production document that was produced in

discoveries, including production from me,

production from Jin, production from Katie,

depositions that we made; have you seen any of that?

A. I have not.

## XI. Eichler Admits It Would Be Wrong to Sue Someone Who Did Not Cause His Loss and Would Change His Position if He Learned Tu Was Not Involved.

**Pages 156:9-25, 157:1-16**  (Examination by Mr. Tu)

Q. Okay. Since this case started, have you

reviewed anything from your side, like documents,

production document that was produced in

discoveries, including production from me,

production from Jin, production from Katie,

depositions that we made; have you seen any of that?

A. I have not.

Q. Okay. Is it important to you that the

people named in the lawsuit are the ones that

actually -- would actually be responsible for your

loss?

A. Yes.

Q. Do you have any concern about any

possibility at all that anyone named in your lawsuit

might not actually contributed to your loss?

A. No concern.

Q. Not concern at all? So it wouldn't matter

27

to you if someone named in your lawsuit didn't

actually cause you loss?

A. It would matter, yes.

Q. Then would you feel any concern or regret

if you found out that you sued somebody that didn't

even cause you harm?

A. Yes, I would.

Q. So if you learned that someone like me,

who didn't even have anything to do with sales,

marketing, or participated in any, like -- your

inability to withdraw Bitcoin, et cetera, would you

change your stance in suing me?

ATTORNEY NAGDEMAN: Objection,

foundation. You can answer, if you know the

answer.

THE WITNESS: Yeah, I would.