## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROSS DETTMERING, FRANCIS MANGUBAT, and all other similarly situated individuals,<br><br>      Plaintiffs,<br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>      Defendants, | Case No.: 22-cv-01482-JLH-SRF |
| MICHAEL EICHLER, and all other similarly situated individuals,<br><br>      Plaintiffs,<br>vs.<br><br>VBIT TECHNOLOGIES CORP, VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10,<br><br>      Defendants, | Case No.: 22-1574-CFC-SR |

# EXHIBIT N

## Exhibit N: Deposition Excerpts of Francis Mangubat (September 4, 2025)

This exhibit contains sworn deposition excerpts from Plaintiff Francis Mangubat demonstrating that he has no personal knowledge of any conduct by Defendant Sean Tu, never communicated with Mr. Tu, and cannot identify any statement or action by Mr. Tu that caused his alleged loss. The excerpts further show that his understanding of events is based on secondhand information, misidentification, assumptions, and interpretations rather than firsthand knowledge; that he repeatedly deferred to counsel for the factual basis of the allegations; and that he cannot confirm the truth of the allegations asserted against Mr. Tu. These admissions undermine Plaintiffs' ability to establish personal involvement, causation, reliance, or evidentiary support as to Mr. Tu.

### I. NO PERSONAL KNOWLEDGE, NO EVIDENCE, DEFERS ENTIRELY TO COUNSEL

**Pages 197:2–25, 198:1–25, 199:1–25, 200:1–21**  (Examination by Mr. Kim)

Q.  And you're seeking damages from

defendants; correct?

A.  Yes.

Q.  So in your mind, who are you trying

to recover damages from?

A.  VBit Tech Corp, VBit Mining LLC,

Advanced Mining Group, Danh Cong Vo, Danh Vo,

Sean Tu, Jin Gao, John Doe individuals 1 to 10,

and ABC companies 1 to 10.

Q.  So you're reading off of this

document that has been marked as Exhibit 20;

2

correct?

A.  No, I'm not.  I just don't want to

discuss the attorney-client privilege with the

strategy of who we decided to name as

defendants.

Q.  I'm not asking for the strategy or

the indications you've exchanged with the

attorney, just your understanding -- your

personal understanding of who should be held

responsible, not your attorneys', not anyone

else's.

MR. SNYDER:  I'm going to object.

I'm going to object.  And if it's possible for

you to answer that question, Francis, without

revealing any communications or work product

that we shared with you, you're welcome to, but

if it's not possible, you're not required to

answer that, as it's -- it would be invading the

attorney-client privilege.

A.  Yes, without invading on

attorney-client privilege, it's not possible for

me to answer that question.

Q.  So you don't have an independent --

without your counsel's input -- independent idea

as to who should be held responsible; is that

correct?

A. Correct.

Q. Okay. And do you agree with all

the allegations that are alleged on this

document that has been marked as Exhibit 20?

MR. SNYDER: Objection.

A. Yes.

Q. And do you have personal knowledge

of each allegations that are asserted here in

this document that's marked as Exhibit 20?

MR. SNYDER: I mean, that's kind of

an incredible memory test, Mitch.

///

BY MR. KIM:

Q. I'm asking you again, Mr. Mangubat,

if you can answer the question --

A. What do you mean by --

MR. KIM: I'm glad that you guys

find this funny, because I don't, because --

MR. SNYDER: I don't find this

funny at all, but the question is complete.

I would like to state, for the

record, this is a 74-page document that Mr. Kim

is asking him if he has personal knowledge of

every word over the course of the 74-page

document, just so the record is clear.

MR. KIM:  Sure.

To make the record clear, Mr.

Mangubat has testified that he reviewed not just

the e-mails but documents that are relevant to

this case in preparation for this deposition,

and also he's a representative plaintiff who is

trying to prove his case.  And so I'm asking him

a question based on his review of the documents,

if he has personal knowledge of allegations of

the document in which he has testified that he

has reviewed, if those are true.

MR. SNYDER:  I'll object to form.

BY MR. KIM:

Q.  Do you -- do you agree -- do you

have personal knowledge of these allegations in

which you testified that you reviewed?

MR. SNYDER:  Objection to form.

BY MR. KIM:

Q.  Do you?

A.  I don't understand personal

knowledge, professional knowledge, and I just

don't -- I'm confused by the context of the

question.

Q.  So do you have personal proof that

you have against each of the defendants that are

named in this lawsuit, based on allegations that

are alleged in this document that is marked as

Exhibit 20?

MR. SNYDER:  Objection to form.

A.  The proof is in the document, but

I'm not a private investigator, I wasn't at

VBit's headquarters, I wasn't there when the

other defendants were deposed.


**Pages 213:14–25, 214:1–25, 215:1–4**  (Examination by Mr. Kim)

Q.  Okay.  Just a few a more questions,

Mr. Mangubat.

What are you trying to accomplish

through this lawsuit?

A.  It would be to serve justice on

everyone that's taken a VBit loss and to uncover

the truth of everything that transpired and/or

happened.

Q.  But you don't have an independent

knowledge of who should be held responsible;

correct?

MR. SNYDER:  Objection.

A.  I don't know.

Q.  Now, you said you wanted to bring

justice; is that correct?

A.  Yes.

Q.  How do you define "justice" as you

used it?

A.  It's to allow a judge or jury to

uncover all the facts and let the legal process

do its course.

Q.  So based on your definition of what

the justice -- the term "justice" means, would

it be fair to say that if there are defendants

that should not be held responsible should also

be relieved of their burden of this lawsuit

based on your term "justice," your definition of

that?

MR. SNYDER:  Objection to form.

A.  Depends on what the judge and jury

say, and I believe in the American legal system.

Q.  Okay.  Are you expecting to make

money from this lawsuit?

MR. SNYDER:  Objection.

A.  No.

Q.  And how much are you trying to

recover from this lawsuit?

A.  I don't think there is much to

recover, and I think that the plaintiffs are

going to lose a lot, a lot of money in the grand

scheme of things.


**Pages 231:13–25, 232:1–25, 233:1–19**  (Examination by Mr. Ratchick)

Q.  Did you read the complaint before

it got filed in this case?

A.  Yes.

Q.  Did you have firsthand, personal

information of the allegations in the complaint

when it was filed?

MR. SNYDER:  Objection.  Are you

referring to the every allegation in the

complaint or do you have a question on a

specific paragraph, Scott?  It's an overbroad

question, impossible to answer.

BY MR. RATCHICK:

Q.  To your recollection, Mr. Mangubat,

when you read the complaint?  Did you have --

did you see any allegations in there that you

believed not to be true?

MR. SNYDER:  Objection to form.

A.  No, because I deferred to my

counsel for the legality of things, and I'm not

a lawyer.

Q.  I'm not asking about the legality

of things.  I'm asking about the facts that were

alleged.  When you read -- as you sit here

today, do you recall that when you read the

complaint, before it was filed, you believed any

of the factual allegations not to have been

true?

MR. SNYDER:  Objection.

A.  Could you go through the specific

findings, the specific factual complaint that

you're referring to?

Q.  Sure.  Let's -- Mitch pulled up the

amended complaint, so let's look at the page

that he's turned to.

Let's look at paragraph 11, and

I'll come back to some of the others.

It says:  Defendants did not

actually lease and/or sell to plaintiffs and the

class the hardware they represented they

controlled and hosted in their data centers; do

you see that?

A.  Yes.

Q.  Do you have any knowledge as to

whether or not that's true?

MR. SNYDER:  Objection.

A.  I don't know whether it's true or

not.  I guess it's up to you attorneys to

present to a judge or jury.

Q.  Okay.  But I'm asking you, you

don't know whether or not that's even true?

A.  I just don't really get the

meaning, defendants not actually lease or sell

to plaintiffs in the class the hardware they

controlled and hosted in their data centers,

it's kind of like -- I'd like to get a

clarification, because it's -- it's just very

legal jargon, I don't –


**Pages 322:7–25, 323:1–25, 324:1–10**  (Examination by Mr. Tu)

Q.  Do you think it would be fair, if

you haven't done anything -- actually, I'm --

I'm going to strike that, because I think that's

asked already.

So after seeing those things, do

you still believe that everything said about

each defendant, including myself, in the -- in

the complaint is true?

MR. SNYDER:  Objection to form.

A.  I don't have all the facts, and I'm

not the judge and I'm not the jury, so I don't

know.

Q.  So to everything to be true, that

means none -- not one allegation can be false;

right?

MR. SNYDER:  Objection, form.

A.  I don't know.

Q.  So to be hundred percent true, that

means all the allegation in the complaint has to

be true?

MR. SNYDER:  Objection.

A.  I don't know.

Q.  Then if one or two of them that we

can specify are not true, wouldn't that make it

not be a hundred percent true?

MR. SNYDER:  Objection.

A.  I don't know and I'm getting

confused.

Q.  I'm just trying to use logic and

I'm not trying to be a lawyer.  I'm only using

common sense.

Like, if there's ten things said

about you that are supposed to be hundred

percent true, your defense would be, you say,

well, if all these things that are -- all these

accusations true, I just have to prove one more

two of them is false, it cannot all be true, you

just flip it; right?  So there is over 200

allegations in the complaint against the

defendants, many against me, many against the

group, many against the others, do you believe

with everything you know today that all of them

are true?

MR. SNYDER:  Objection.

A.  I don't know.  I defer to my

attorneys for having the legal expertise.

Q.  Okay.  You said under oath that you

have no personal knowledge that I've contacted

you, made promises or caused harm.  Wouldn't --

including me in a lawsuit like this, risk being

a frivolous claim?

MR. SNYDER:  Objection.

A.  I don't know.  I defer to my

counsel as to your liability, legal liability.


**Pages 324:16–25, 325:1–25, 326:1–22**  (Examination by Mr. Tu)

Q.  Okay.  I only got maybe less than

10 questions, and hopefully they're -- they're

fast.

So is it important -- is it

important to you that the people that you've

named in your lawsuit are the ones actually

responsible for your loss?

A.  That's for the Court and the judge

to decide.

Q.  So you don't -- you're going to

wash your hands with this and let other people

decide?

MR. SNYDER:  Objection.

A.  I believe in the American legal

process.

Q.  Did you -- that's asked already.

Would it matter to you if someone

named in your lawsuit didn't actually cause your

loss?

A.  I don't know.

Q.  Do you know that it is possible in

civil lawsuits that sometimes the victor doesn't

go to -- doesn't go to the person who's right or

wrong, it goes to the person with the best

lawyers?

MR. SNYDER:  Objection to form.

A.  It's possible.  I don't know case

law, so...

Q.  Would you feel any concern or

regret if you found out that someone you sued

hadn't actually done anything to harm you?

A.  No.  Because my family has lost

multiple six figures, hundreds of thousands of

dollars through -- through the company that you

work for.

Q.  But that wasn't the question.  The

question was:  Will you feel regret if you found

out that someone you sued didn't cause you harm?

MR. SNYDER:  Objection to form.

A.  No, that's the legal process in

America.

Q.  So that's -- that's where you

stand, that's the legal process, you're okay

with -- with people getting sued even if they

didn't do anything wrong?

A.  Yes.  And unfortunately, I've been

in similar position where I haven't done

anything wrong, and I got lumped into a

corporate suit, so we are in the same position,

my friend.

Q.  So last question, have you -- if

you learned, hypothetically, that I wasn't

involved in -- in any action that directly

causes your loss, will you change how you feel

about suing me?

MR. SNYDER:  Objection to form.

A.  I just go by what my attorneys have

recommended and defer to their legal expertise.


## II. HEARSAY, MISIDENTIFICATION, AND RELIANCE ON THIRD PARTY

**Pages 27:4-25, 28:1-2**  (Examination by Mr. Kim)

Q.  So is it your understanding --

again, I'm not asking for your legal

understanding, that's not what I'm asking, just

based on your understanding and your

background -- is it your understanding that

there is a professional Crypto trader?

A.  There are people that trade Crypto

for their careers.  I don't know if that

designates them legally as being a

cryptocurrency professional, so I defer to

counsel for the legal definition of

cryptocurrency professional.

Q.  I'm not asking, again, for

counsel's definition or legal definition,

it's -- I just want your definition, that's it,

is -- in your mind, is there a cryptocurrency

professional?

A.  My opinion is that if a majority of

someone's income is derived from dealing with

cryptocurrency, in my mind, they would -- in my

opinion, is that they would be a cryptocurrency

professional, in my opinion.  I think that

Mr. Tu and Mr. Gao are cryptocurrency

professionals.

**Pages 32:13-25, 33:1-25, 34:1-11**  (Examination by Mr. Kim)

Q.  So I'll go back two questions so

that I can provide some context and refresh your

recollection.

So you provided a testimony saying

that you got to know about VBit through other

real estate professionals, who informed you that

16

there's a company that was a profitable Bitcoin

mining company, that was locally managed, and

that that's what you heard from those -- those

other real estate professionals about VBit

Technologies; correct?

A.  Yes, correct.

Q.  Did you rely on those

representations to decide or help you decide to

purchase the packages or package from VBit

Technologies Corporation?

A.  Yes.

MR. SNYDER:  And I'll make the same

objection to form, and you can answer, Francis.

BY MR. KIM:

Q.  Your response is yes?

A.  Yes.

Q.  Alongside, with those

representations that were provided to you by

those real estate professionals, why were you

interested in VBit Technologies Corporation?

A.  It seemed like a profitable

investment.

Q.  So if it wasn't for those other

real estate professionals that you mentioned,

that gave you positive reviews of VBit

Technologies, would you still have decided to

engage in a transaction with VBit Technologies?

MR. SNYDER:  Objection to form.

A.  If it were not for those other real

estate professionals I would not be introduced

to VBit.  I would never have heard about VBit.

Q.  Would you be able to provide the

names of those real estate professionals that

you mentioned?

A.  Lara Ertwine, Nigel Richards, John

Colabelli.

Q.  I'm sorry but would you be able to

spell them for the record?

A.  Lara, L-a-r-a, Ertwine,

E-r-t-w-i-n-e.  Nigel Richards, N-i-g-e-l,

Richards, R-i-c-h-a-r-d-s, John, J-o-h-n,

Colabelli, C-o -- I don't know if it's L or LL,

a-b-i, I don't know if it's L or l-l-a.


**Pages 34:21–25, 35:1–25, 36:1–6**  (Examination by Mr. Kim)

Q.  Did you do any independent research

on VBit Technologies Corporation prior to your

transaction with them?

A.  I just looked at Bitcoin mining and

I took the recommendation that Jin Gao and Danh

Vo, were local, and I believed they had an

advertisement in Philadelphia Style magazine,

how they were local in Philadelphia, their

office is on Washington Avenue, so that was the

due diligence that I did, and also looking at my

friends' accounts and how the Bitcoin was being

mined daily, the price of the Bitcoin miners,

that checked out, so it would -- and then their

financed packages and how it was disclosed that

VBit had some sort of bank financing, and that

seemed very legitimate.

Q.  Where did you obtain all this

information that you just mentioned?

A.  Through one gentleman, Nixon, I

don't know his last name, but Nixon said he knew

Jin Gao and Danh Vo very well, it was Nixon that

presented all of the information and we ended up

even going to the VBit office on Washington

Avenue.

Q.  And to the best of your

understanding, was Nixon an employee of VBit

Technologies Corporation?

MR. SNYDER:  Objection to form.

A.  No, but Nixon spoke about his tight

relationship with Jin Gao and Danh Vo.

Q.  What type of relationships?

A.  How they were -- how Nixon was not

an employee of VBit, but he was basically --

very intimately involved in the operations and

Nixon vouched for Jin Gao, Danh Vo, and was

saying how Sean Tu was a great guy.


**Pages 45:25, 46:1-25, 47:1-25, 48:1-13**  (Examination by Mr. Kim)

Q.  Were you, at any time, aware of

VBit Technology corporation's corporate

structure?

A.  No.

Q.  Did you, at any time, know the

total number of employees at VBit Technology

Corporation?

A.  My interpretation of employees that

it was Danh Vo, Jin Gao, and Sean Tu essentially

running the whole thing.

Q.  Okay.  So your -- your

understanding was that there are three total

employees at VBit Technologies Corporation?

A.  No.  My understanding is that there

20

were three main guys running the company, and I

don't know in what capacity they were hiring

help to run operations, specifically. I don't

know whether they were doing the machine

management in-house, through their employees, or

whether they were subcontracting that out to

another company or person.

Q. Do you know the job titles of any

of the employees of VBit Technologies

Corporation?

A. I don't know, specifically.

Q. Okay. Do you know, at any time did

you know the specific job duties or

responsibilities of any of the employees of VBit

Technologies Corporation?

A. No, it was just my general

understanding that the three prong guys that

were in charge of running the company were Danh

Vo, Jin Gao, and Sean Tu.

Q. Other than Danh Vo, Jin Gao, and

Sean Tu, did you know the names of any of the

employees at VBit Technologies Corporation?

A. I think there may have been one

other entry-level employee, but I was unclear of

whether he was a VBit associate doing mining or

whether he was actually an employee.

Q.  So you weren't sure of that -- his

status, employment status with VBit; is that

correct?

A.  Yes.

Q.  Okay.  So in terms of Danh Vo, did

you understand what his position was, at any

time, with VBit Technologies Corporation?

A.  Not specifically what his position

was, it was my understanding that he was the

majority shareholder, CEO, president, managing

member, managing partner of VBit.

Q.  So how did you come to know that

Danh Vo, Jin Gao, and Sean Tu were the main

figures at VBit Technologies Corporation?

A.  Through Nixon representing that.

Q.  And did Nixon tell you this in

person, by phone, in what way?

A.  In person, at the VBit office.

Q.  Other than Nixon, did you at any

time communicate with anyone from VBit

Technologies Corporation?

A.  No.  Aside from my e-mails asking

for a refund when VBit sent an e-mail stating

that they were refunding everyone.


**Pages 134:1–25, 135:1–10**  (Examination by Mr. Kim)

Q.  Okay.  So your understanding, and

the concept of commissions being earned at VBit,

was learned from who?

A.  Nixon.

Q.  And nobody else; is that correct?

A.  Well, Nixon -- Nixon was showing

some -- a meeting with -- I'm not sure if it was

Sean Tu, or another guy, Jin Gao walked me

through it but, really, they -- they -- a couple

people were looking at it, but I just didn't --

wasn't really paying attention.  I never cared

about that.

Q.  And when you say that Sean Tu, Jin

Gao was walking you through it, and how did they

do that?

A.  I think it was a webinar or zoom

link, something like that.  I don't remember.

Q.  Okay.  So when it is a webinar,

would you have participated remotely, just as we

are right now?

A.  No.  I think I was with Nixon when

it was -- I was with Nixon when it was going on.

Q.  So when you say when it was going

on, are you saying the webinar?  Are you

referring to the webinar?

A.  I don't remember.  I don't

remember.  It's -- I don't remember.  It was so

long ago.  There -- there was something going on

where Sean Tu or Jin Gao were going through

the -- the -- how you make money from it, and

Nixon was going through it, I never -- I wasn't

paying -- paid attention to it, the intricacies

and the detail.  So however everything works, I

just, quite frankly, didn't care.  I was focused

on my real estate business.


**Pages 137:3–25, 138:1–12**  (Examination by Mr. Kim)

Q.  So those webinars you mentioned, do

you recall how many, exactly, there were?

A.  No, I don't.  I don't recall.

Q.  At least the ones that you

mentioned?

A.  I don't -- I remember -- I remember

of one specific event, or with Sean Tu, or Jin

Gao talking about the compensation plan.

Q.  And do you recall when that was.

A.  No.

Q.  Approximate year, month?

A.  I would say early 2022.

Q.  So would it be somewhere after --

sometime after -- after the sale of VBit

Technologies to Advanced Mining or before?

A.  I don't remember if it were --

let's say January, February, March, April of

2022.

Q.  After that first meeting, in

person, that you had with Nixon, at the VBit's

office, did you ever go back to their office at

any time after that?

A.  No.

Q.  Why not?

A.  There was no need -- there was

nothing -- to me, I haven't met Sean Tu or Danh

Vo or those guys.

Q.  Let me show you -- sorry, this is

taking a little bit to upload.

Mr. Mangubat, you've never spoken

to Jin Gao directly; correct?

A.  Correct.

Q.  And you've never spoken to Sean Tu

directly; correct?

A.  Correct.


**Pages 249:5–25, 250:1–25, 251:1–12**  (Examination by Mr. Ratchick)

Q.  Did he give you any information

about his understanding or belief as to what had

happened or what was going on at the time?

A.  He was saying that Danh Vo was

traveling all the time, back and forth from

Vietnam.

Q.  What did that mean with regard to

your concerns about VBit or Advanced Mining?

A.  My interpretation was that Danh Vo

was so rich from all the Bitcoin that he stacked

up, and the company being successful, and

apparently Danh Vo sold a prior company for

millions or tens of millions, that Danh Vo was

basically retired and that Jin Gao and Sean Tu

were -- were running the company on his behalf,

and basically Danh Vo is retired, semi-retired.

Q.  Is that what Nixon told you?

A.  Along the lines of.

Q.  What did he tell you about Lillian

Zhao and Advanced Mining?

A.  He thought it was great that this

large company is buying our company and it's

only a more -- more room to grow.

Q.  So how does that comport with him

telling you that Jin Gao and Sean Tu own the

company and were in charge?

MR. SNYDER:  Objection to form.

A.  That Sean Tu and Jin Gao were

running the company with Danh Vo as the managing

partner running it on Danh Vo's behalf.

Q.  This is in June of 2022?

A.  Yeah, I don't know all the specific

details of -- it's all technically hearsay.

Q.  Oh, okay.  Hearsay aside, I want to

know what Nixon told you.  First, let's break

down what you just said.

I believe you said that Nixon told

you that Danh Vo was retired and that Jin Gao

and Sean Tu now owned the company and were

running it; is that your testimony?

MR. SNYDER:  Objection to form.

A.  No, that's not correct.  I never

said that Jin Gao and Sean Tu owned the company.

What I had said, specifically, is that Danh Vo

is just making so much money, and has made so

much money, that he somewhat works at his own

leisure, whenever, wherever he wants, basically

all around the world, and that if he's in

Vietnam with family that the gentleman running

VBit, Advanced Mining, on Danh Vo's behalf, are

Jin Gao and Sean Tu.  That's my interpretation.

Q.  That was your interpretation or was

that what Nixon told you?

A.  A combination of both, and I just

don't know in verbatim specifically what he

said.  I don't have a tape recorder to where I

can play it back, so that is my best

recollection of my conversation with Nixon.


**Pages 292:15–25, 293:1–25, 294:1–25, 295:1–25, 296:1–25, 297:1–19**  (Examination by
Mr. Tu)

Q.  Okay.  So at the time of your

purchase, did you know who I was, personally?

A.  No.

Q.  You're looking at my face right

now, do I look familiar to you?

A.  No, I just heard hearsay through

28

Nixon.

Q.  Yeah.  So I -- I still have to ask

these questions, because I have them prepared.

Do you -- did I have any direct

role in your decision to purchase VBit for

yourself or on behalf of your family, like your

father, you mentioned your brother earlier?

A.  No, other than your role of your

corporate role with VBit, which I don't know at

the moment.

Q.  So when did you first learn that I

was connected with VBit?

A.  Through Nixon.

Q.  Did you have any idea when I was --

when I first joined VBit or when I was employed

by VBit?

A.  I don't.  I just know that you were

involved from when I purchased my first package.

Q.  Just to be clear, for the record, I

was employed by VBit sometime August 2020.

A.  Okay.

Q.  I wasn't there at the founding.

Did Nixon told you when he joined

VBit as an affiliate?

A.  He may have mentioned it, but I

don't remember, four years, it's 2021, so --

Q.  Okay.  And in your earlier

deposition you stated that Nixon told you -- and

I'm paraphrasing now -- that Danh Vo, Jin Gao,

and Sean Tu were local to Philadelphia.

Do you recall making a statement

like that?

A.  Yes.

Q.  Have you ever met me in person or

seen me in the office or when you visited the

VBit office in Washington at any time?

A.  There were multiple people at the

VBit office.  I don't know whether you were

there or not.

Q.  How well do you know Nixon?

A.  I just met him a couple times,

spoken to him a couple times through -- through

VBit and my real estate friends.  I don't -- I

would say I don't know him very well.

Q.  When you say a couple times, you

don't mean two times.  You mean because

primarily it sounds like you talked to him more

than two times.

A.  Yes.  Talked on the phone is

different than meeting in person, yes.

Q.  So did Nixon specifically tell you

how he knows me, personally?

A.  No, Nixon just stated that you are

in the loop and running the company with Danh Vo

and Jin Gao.

Q.  Did he ever mention how he met me

or spoke with me or seen me in person?

A.  Not specifically, just in the terms

that he knew you guys well.

Q.  So just to be clear, it sounds like

Nixon is your primary source of information or

your source of truth about me?

A.  Yes.

MR. SNYDER:  Objection.

BY MR. TU:

Q.  I'm going to ask this question that

was asked before, I'm sorry about that.

You said that you read the

complaint, first complained filed in this case;

correct?

A.  Yes.

Q.  So you may have -- then you may

have noticed that my residence or my mailing

address is not listed in Philadelphia.  Did you

notice that?

A.  I wasn't really paying attention to

that.  It's also possible that I -- you could

have been local to Philadelphia and moved to a

different address, so that's why it didn't dawn

on me to pay any special attention to that.

Q.  Okay.  Just to clarify, for the

record, I have not lived in Philadelphia for

over two decades.  I currently live in

Minnesota.

A.  Okay.

Q.  Now, just to clarify, so -- so

given that you were introduced, are you certain

that Nixon specifically said that I was local to

Philadelphia?

MR. SNYDER:  Objection.

A.  I don't recall.

Q.  If it turns out that Nixon told you

that I was local to Philadelphia, and that's not

accurate, will you agree that his other

statements could also warrant some careful

scrutiny?

A.  So he said the company is based out

of Philadelphia, and there's a Philadelphia

office.  I -- I could have not known that where

specifically you work and where your work

remote, but to my understanding, this is just my

interpretation, that the company's based in

Philadelphia and you're a top three person

involved in running the company.

So you don't work in -- you don't

live in Philadelphia, but you work for the

company that is -- that's headquartered in

Philadelphia, with a corporate office in

Philadelphia, has mining machines in three

locations around the country.

So in my opinion, you're still

operating a Philadelphia-based headquartered

company in Washington Avenue.

Q.  Yeah, I understand that's your

opinion, but you also said earlier that you

base -- base your trust with the company and

Nixon on his word to say that I was located in

Philadelphia and that led you to believe that I

was local to Philadelphia.  I'm just asking for

clarification on that.

MR. SNYDER:  Objection to form.

A.  I don't know.  I mean to get to the

specifics of a conversation four years ago, with

no phone recorder, it's just difficult.


**Pages 297:20–25, 298:1–25, 299:1–25, 300:1–13**  (Examination by Mr. Tu)

Q.  Well, thank you for that.  It is

difficult, but this is costing me a lot of -- a

lot of time and damage to defend myself right

now based on -- based on that -- based on that

one comment.

So just to be clear, in both my

deposition and my written responses to -- to the

interrogatories -- to the interrogatories, I've

stated, under oath, that I was not involved in

the VBit affiliate program and I never

participated in sales or marketing.

However, early today you testified

that you recall seeing a webinar where I

supposedly presented the affiliate program or

the compensation for how the compensation

program works; is that correct?

A.  I believe I said it was Sean Tu and

Jin Gao, and I don't know who, and your names

kind of sound similar, and -- well, yeah, they

sound kind of similar.  They're both

Asian-derived names, as Tu and Gao are Asian

descents, as well, so I don't -- again, I did

not have a tape recorder to Nixon so when Nixon

made a reference to Sean Tu, Jin Gao, Danh Vo,

to me it all kind of sounds similar.

So to discern specifically a

conversation from 48 months ago, it's -- it's

very hard to derive specifics.  I could just

speak in generalities.

Q.  I understand.  So earlier in this

deposition you said you understood the

difference between a guest and a best

recollection, a best recollection.  Do you still

stand by that understanding?

A.  Yes.

Q.  So given that you are a hundred

percent certain, based on your best

recollection, have you -- have you ever seen me

presenting anything in -- in one of these

webinars?  You said you have joined a few times,

have you ever seen me?

A.  No, because, like I said in my

original testimony, I wasn't paying attention to

the webinar and it was either hosted by Sean Tu

or Jin Gao.

So if you're testifying that you

were not on a webinar, I mean, we -- then it

must have been Jin Gao that was explaining the

compensation plan.

Q.  Well, I'm not the one being

deposed, so I can't testify.  I'm asking

questions.

A.  Oh, okay.

Q.  But I did gave previous deposition

I can ask if you looked at the previous

deposition?

A.  No, I didn't look over your

deposition, so --

Q.  So could it be possible that you

could be confusing me with someone else or

misremembering what was in the webinar?

A.  With Jin Gao, yes, or Danh Vo, yes,

it's probably Jin Gao.

Q.  Do we all look alike?

MR. SNYDER:  Objection.

BY MR. TU:

Q.  Because you're mixing me with

three -- two to three other persons.

A.  Yeah, in conversation --


**Pages 300:14–25, 301:1–25, 302:1–25, 303:1–23**  (Examination by Mr. Tu)

Q.  Including our names.  Including our

names.  Okay.  I'll move on.

So, Mr. Mangubat, as you sit here

today do you believe that you made a deliberate

effort to include me in this lawsuit apart from

the other defendants?

MR. SNYDER:  Objection.

A.  I'll defer to my counsel, and so my

answer to that is:  I don't know, because I am

not a lawyer, so I'm just going by counsel.

Q.  I'm not a lawyer, either.  I'm

just -- so I -- it's -- I'm just trying to

defend myself, too.

A.  Yes, of course.

Q.  So do you agree that naming someone

in a lawsuit, without direct evidence or

personal knowledge, can be harmful to their

reputations, their financing, and their personal

life?

A.  I can relate to you, Mr. Tu, I just

got named in a similar lawsuit and similarly

have also had to defend myself, so I know where

you're coming from completely.

Q.  Okay.  Thank you.  Do you know what

the term "hearsay" means, since you mentioned it

a few times?

A.  Hearsay under the corporate veil?

Q.  No, hearsay, hearsay.

A.  Somewhat, I don't know the legal

definition, and I'm not a lawyer.

Q.  Me neither, but just in general,

common sense, do you know what the common --

common sense what the term "hearsay" means?

A.  I don't know the specific legal

definition.  Feel free to educate me on that.

Q.  I can't educate you.  I'm not a

lawyer, myself, but just in general hearsay is

to me some -- refers to something that a person

say that they heard from someone else rather

than something that they personally saw or

experienced, but that's what makes sense to me

when I think about hearsay.

What's your definition of

"hearsay"?  Do you agree with that?

A.  I agree with your definition and

that hearsay goes hand-in-hand with my

testimony, because my testimony from this

definition summarizes that I received a majority

of my representations about VBit and Advanced

Mining through the gentleman, Nixon.

Q.  So would you -- just a moment, but

would you want to be sued or personally named in

a suit, lawsuits, based solely on what someone

else would say about you, about any direct

knowledge or evidence on you?

MR. SNYDER:  Objection.

A.  I just went through the same

experience that you have, so --

Q.  Well, thank you.

A.  So I understand and feel from where

you're coming from.

Q.  As you sit here today, can you

identify any specific facts, statement, or

action that I personally took, separate from my

job title or employment at VBit, that caused you

harm?

MR. SNYDER:  Objection to form.

A.  I do not know specifically your

options that could have caused harm.  I just

know that VBit as a company lost investors in

the millions or tens of millions of dollars, and

that you just happened to work for the company,

VBit, so it's up to a judge and a jury to decide

your involvement in that.

Q.  Okay.  Before or at the time you

purchased VBit, did you have any personal

knowledge that I was an owner or founder or

maybe shareholder in VBit or not?

A.  I don't know your status as to

whether you have equity in the company or

specifically what your role was or what you were

being compensated by the company.

Nixon just mentioned that Danh Vo,

Sean Tu, Jin Gao were the three gentlemen that

are operating the company.


**Pages 303:24-25, 304:1-25, 305:1-25, 306:1-25, 307:1-25**  (Examination by Mr. Tu)

Q.  So earlier in your deposition, you

stated that you considered me a cryptocurrency

professional; do you recall making that

statement?

A.  Yes.

Q.  And just to clarify, are you

offering your own definition of a cryptocurrency

professional, do you recall how you defined the

term?

A.  In my opinion, yes, although I

don't know if there's a legal definition for

cryptocurrency professional similar to real

estate professional.

Q.  I'm just going to go with your

definition, use what you said it is on my -- on

my questions, is that okay?

A.  Yes.

Q.  So based on how you define what a

cryptocurrency professional is, can you explain

why you believe I qualify as a cryptocurrency

professional?

A.  Because at the time you worked for

a company VBit, who's basic -- whose business is

basically to mine Bitcoin, and I would assume

that a majority of your income had came from

VBit, and that was your full-time role, and in

my mind, not a legal definition, making you a

cryptocurrency professional, in my mind, not in

legal definition.

Q.  So working for a company that deals

with mining would make any employee a

cryptocurrency professional?

A.  Well, specifically when you look at

real estate, my assistant seen as a 1099, which

she does real estate activities and I think per

the IRS code based on work, what her activities

are on a day-to-day basis, it would constitute

her as a real estate professional.

So I don't know the specific legal

definition for being considered a cryptocurrency

professional or a judge or jury seeing you as a

cryptocurrency professional.

Q.  Do you have any IT person in your

agency right now?

A.  No, I don't deal with that.

Q.  But do you have an IT team or IT

person?  Is there an IT person in your agency?

A.  No, because I -- I don't know

how -- I'm not an owner in the brokerage or

don't know how the brokerage is ran.  I'm just a

real estate agent that's sells real estate.

Q.  Okay.  But do you think there's an

IT person there, is there an IT team, IT

department?

A.  Yes.  Yes.

Q.  Do you think that IT guy is a real

estate professional?

A.  No.

Q.  Okay.  Have you seen any

documentation, such as spreadsheets or VBit

showing my income in cryptocurrency?

A.  No.

Q.  Do you know that such document

exists?

A.  I've heard of it through counsel.

I didn't elaborate or talk about the specifics.

Q.  So you can see the document any

time just by requesting it; right?

MR. SNYDER:  Objection.

A.  Yes.

Q.  Are you going to answer that?

A.  I answered yes.  It must have been

cut off.

MR. SNYDER:  I objected at the same

time he was answering.

MR. TU:  Oh, okay.

BY MR. TU:

Q.  Have I ever promoted or presented myself to you as a cryptocurrency expert saying, hey, I'm cryptocurrency expert?  Have I ever promoted myself as such?

A.  I've never spoken to you before today, just hearsay through Nixon, so no.

Q.  Did Nixon present me as a cryptocurrency expert?

A.  Nixon presented you as one of the main people running VBit.

Q.  Did he present me as a cryptocurrency expert or professional?

A.  I don't recall.

Q.  So just to clarify, it is your belief earlier that you -- that I'm a crypto expert, solely based on the fact that I was employed by VBit?

A.  Yes.

Q.  So without having spoken to me or without any knowledge of my specific role or access to -- to my compensation records, what makes you think that I earn a majority of my income through cryptocurrency?

A.  I don't know.

### III. NO INTERACTION WITH TU, NO REPRESENTATIONS, NO PERSONAL KNOWLEDGE, AND NO CAUSATION

**Pages 231:13–25, 232:1–25, 233:1–19**  (Examination by Mr. Ratchick)

Q.  Did you read the complaint before

it got filed in this case?

A.  Yes.

Q.  Did you have firsthand, personal

information of the allegations in the complaint

when it was filed?

MR. SNYDER:  Objection.  Are you

referring to the every allegation in the

complaint or do you have a question on a

specific paragraph, Scott?  It's an overbroad

question, impossible to answer.

BY MR. RATCHICK:

Q.  To your recollection, Mr. Mangubat,

when you read the complaint?  Did you have --

did you see any allegations in there that you

believed not to be true?

MR. SNYDER:  Objection to form.

A.  No, because I deferred to my

counsel for the legality of things, and I'm not

a lawyer.

Q.  I'm not asking about the legality

of things.  I'm asking about the facts that were

alleged.  When you read -- as you sit here

today, do you recall that when you read the

complaint, before it was filed, you believed any

of the factual allegations not to have been

true?

MR. SNYDER:  Objection.

A.  Could you go through the specific

findings, the specific factual complaint that

you're referring to?

Q.  Sure.  Let's -- Mitch pulled up the

amended complaint, so let's look at the page

that he's turned to.

Let's look at paragraph 11, and

I'll come back to some of the others.

It says:  Defendants did not

actually lease and/or sell to plaintiffs and the

class the hardware they represented they

controlled and hosted in their data centers; do

you see that?

A.  Yes.

Q.  Do you have any knowledge as to

whether or not that's true?

MR. SNYDER:  Objection.

A.  I don't know whether it's true or

not.  I guess it's up to you attorneys to

present to a judge or jury.

Q.  Okay.  But I'm asking you, you

don't know whether or not that's even true?

A.  I just don't really get the

meaning, defendants not actually lease or sell

to plaintiffs in the class the hardware they

controlled and hosted in their data centers,

it's kind of like -- I'd like to get a

clarification, because it's -- it's just very

legal jargon, I don't –


**Pages 291:21–25, 292:1–14**  (Examination by Mr. Tu)

Q.  Yeah, I think that's about what

I -- I'm not a lawyer, too, so I guess common

sense that makes sense to me, too.

So you understand that in a civil

case, even if a person is not found liable, they

can spend a significant amount of time and money

just to defend themselves?

A.  Yes.

Q.  Are you aware that defending

against a civil lawsuit can involve months,

years, legal filing, depositions, financial

costs for someone who is ultimately not even

responsible?

A.  Yes, although I don't know whether

you're responsible or not, and I would say that

your depositions are critical to the judge, jury

deciding who ultimately is responsible for

individuals losing millions and millions, if not

tens of millions of dollars.


**Page 308:1–8**  (Examination by Mr. Tu)

Q.  So you and I -- I just want to

clarify, and you and I, we've never spoken in

person, exchanged text messages, e-mails, this

is the first time I'm talking to you; correct?

A.  Correct.

Q.  So that means I've never given you

any advice or pitch anything about VBit to you?

A.  Correct.


**Pages 308:9–25, 309:1–13**  (Examination by Mr. Tu)

Q.  And that means that if I would ask

you to describe any action I took on my own that

would make me -- that would make me responsible

for your loss, would you be able to describe

anything?

A.  You work for the company that --

you work for VBit, so --

Q.  Is that the only -- is that the

only thing you're holding me accountable for,

that I work for the company that caused your

loss?

A.  Yes.

MR. SNYDER:  Objection.

BY MR. TU:

Q.  But do you have any proof that I

personally caused you loss as an individual?

MR. SNYDER:  Objection.

A.  No.

Q.  Can you name anything that I

caused, according to your statements, can you

name anything that I did that costs your -- your

claim according to your statements in this

lawsuit?

MR. SNYDER:  Objection.

A.  I defer to counsel and the

specifics of the complaint that we filed.

Q.  Okay.  Outside your -- you defer to

counsel, can you name anything?

A.  I defer to counsel, and I'm not a

lawyer.


**Pages 313:21–25, 314:1–25, 315:1–25, 316:1–25, 317:1–5**  (Examination by Mr. Tu)

Q.  Okay.  So again, just to confirm,

earlier you said you read both the complaint and

the first amended complaint; correct?

A.  Yes.

Q.  And I believe that was Exhibit

maybe 22 or 20, Exhibit 20, I don't know if

Mitch wants to show it again, but I think you've

seen it a few times already.

MR. KIM:  Yeah, sure.  I could show

it.

BY MR. TU:

Q.  And just to simplify it, I'm just

going to refer to the complaint or the FAC or

for simplicity.

A.  Yes.  Similar to you, Mr. Tu, and

when you were unsure of what exhibit it was in

the complaint, there's hundreds of pages of

documents so it's easily -- it's easy to get

lost in the verbiage and in the hundreds of

pages of documents.

Q. So just to confirm, you said

earlier that you understand that the very first

paragraph of the complaint defines defendants as

to include all the named individuals and the

companies put together; correct?

MR. SNYDER: Objection.

A. Yes.

Q. Are you familiar with the concept

of lumping in legal proceedings?

A. No, I'm not aware.

Q. It generally refers to when

allegations are made against a group of

defendants about specifying what each person

did, like -- like -- it's like painting everyone

with the same brush even if their roles are very

different.

A. Makes sense.

Q. Do you understand that the

complaint makes many allegations, at least 38 of

them, against the entire group of defendants all

on the same brush?

MR. SNYDER: Objection to form.

A.  Sure.

Q.  Are you also aware that the

complaints alleged by all defendants, including

myself, engaged in things like sales marketing

and making presentations, making presentations,

webinars, et cetera?

A.  Sure.

Q.  So that means that when -- when

it -- when someone has made a complaint against

that lumped group, they're also saying that I --

I did it, too, or that I have also done it.

MR. SNYDER:  Objection to form.

///

BY MR. TU:

Q.  That I've participated?

MR. SNYDER:  Sorry, objection to

form.

A.  You work for VBit advanced buying,

so yes, you're included in the complaint.

Q.  But the complaint alleged specific

things to this -- to this bulk of individuals,

so, like, I'll clarify, right?

Have I ever did anything in sales

and marketing to you, because there were alleged

allegation that said in that effect that I've

sold you something?

Did I ever sell you anything?

A.  No, you just worked for the company

that did sell me something.

Q.  Did I market anything to you?

A.  No, you just worked for the company

that did VBit and Advanced Mining.

Q.  Did you make any payments to me?

MR. SNYDER:  Objection to form.

BY MR. TU:

Q.  There were allegations that said

that you made payments to me, so I'm asking:

Did you make payments to me?

MR. SNYDER:  Objection to form.

A.  I did not make a payment to

Sean Tu, personally, I made a payment to the --

and payments to VBit and the company that Sean

Tu worked for.


**Pages 322:7–25, 323:1–25, 324:1–10**  (Examination by Mr. Tu)

Q.  Do you think it would be fair, if

you haven't done anything -- actually, I'm --

I'm going to strike that, because I think that's

asked already.

So after seeing those things, do

you still believe that everything said about

each defendant, including myself, in the -- in

the complaint is true?

MR. SNYDER:  Objection to form.

A.  I don't have all the facts, and I'm

not the judge and I'm not the jury, so I don't

know.

Q.  So to everything to be true, that

means none -- not one allegation can be false;

right?

MR. SNYDER:  Objection, form.

A.  I don't know.

Q.  So to be hundred percent true, that

means all the allegation in the complaint has to

be true?

MR. SNYDER:  Objection.

A.  I don't know.

Q.  Then if one or two of them that we

can specify are not true, wouldn't that make it

not be a hundred percent true?

MR. SNYDER:  Objection.

A.  I don't know and I'm getting

confused.

Q.  I'm just trying to use logic and

I'm not trying to be a lawyer.  I'm only using

common sense.

Like, if there's ten things said

about you that are supposed to be hundred

percent true, your defense would be, you say,

well, if all these things that are -- all these

accusations true, I just have to prove one more

two of them is false, it cannot all be true, you

just flip it; right?  So there is over 200

allegations in the complaint against the

defendants, many against me, many against the

group, many against the others, do you believe

with everything you know today that all of them

are true?

MR. SNYDER:  Objection.

A.  I don't know.  I defer to my

attorneys for having the legal expertise.

Q.  Okay.  You said under oath that you

have no personal knowledge that I've contacted

you, made promises or caused harm.  Wouldn't --

including me in a lawsuit like this, risk being

a frivolous claim?

MR. SNYDER:  Objection.

A.  I don't know.  I defer to my

counsel as to your liability, legal liability.


## IV. FAILURE TO READ CONTRACT / ASSUMPTION OF RISK / DISCLAIMERS / IGNORED MATERIAL TERMS

**Pages 61:12–25, 62:1–25, 63:1–7**  (Examination by Mr. Kim)

Q.  Okay.  Now, this contract that you

see on the screen, you reviewed it before you

signed it; correct?

A.  I reviewed it in the manner that's

the same as reviewing a refresher of Apple app

or the -- like an Uber, let's say, 20-page

whatever, you kind of just click through and

sign it.

Q.  So you didn't -- is it your

testimony that you didn't thoroughly go over

each of the terms of this contract?

A.  Yes.

Q.  So you just kind of perused through

it; is that correct?

A.  Yes.

Q.  Okay.  Let's go look at this

paragraph where it has a payment information.

Does -- it says:  A payment of $78,231 to pay to

the service provider upfront; do you see that?

A.  Yes.

Q.  Is $78,231 a small amount for you?

A.  No, it's a lot of money.

Q.  And yet you didn't care to look

through the contract carefully before you signed

it?

MR. SNYDER:  Objection.

A.  I just wanted to look at the

numbers, and the numbers seemed to add up and

matched the representations that the Bitcoin

mined, and it all seemed to add up, and I saw

the -- that my friends were mining the Bitcoin

that VBit was representing that it would mine,

so, in my book, that checked out.

Q.  So you didn't bother reviewing the

contract terms carefully; is that correct?

A.  That's correct.  In the same way I

don't read an Uber user, and when -- an Uber app

prior to using it, I don't -- I don't read

through all of the disclosures in that contract,

and same thing with the social media sites and

Venmo, I don't -- I don't read through Venmo's

user agreement with everyone.

Q.  Okay.  So when you say Uber, and

those disclaimers and whatnot, you're not

sending $78,000 to Uber at one time; are you?

A.  No.


**Pages 89:9–25, 90:1–25, 91:1–25, 92:1–24**  (Examination by Mr. Kim)

Q.  And I want you to look at page 10

of what's been marked as Exhibit 2, specifically

section 10.3, it says:  Their customer's sole

remedy for performance or nonperformance of the

terms of this agreement shall be a refund of any

monies or fees paid to service provider for

unused products and services; do you see that?

A.  I do.  I don't know what it means.

Q.  Okay.  That's fine.  But you

understand what that -- well, strike that.

Your testimony is that you didn't

read this sentence or this section 10.3 prior to

today; correct?

A.  Correct.

Q.  Okay.  And similarly, 10.4 says:

Customer agrees to look exclusively to

customer's insurer to recover for injury or

damage in the event of any loss or injury and

releases and waives all right of recovery

against service provider; do you see that?

A. Yes.

Q. And this is your first time reading

this; correct?

A. Well, I skimmed through it and

clicked the buttons when I signed it, so I don't

know if that -- I don't know what you're

alluding to when you say it's your first time

reading this, so I --

Q. I'm not alluding to anything.

A. I will admit I docusigned the

document.

Q. I'm not alluding to anything. The

question is simple: This is the first time you

are reading this section; correct?

A. Yes. Yes, correct.

Q. And now I want you to look at

section 15, page 12 of what's been marked as

Exhibit 2, the first paragraph states: You

state and confirm to us that you possess

knowledge of cryptocurrencies, such as Bitcoin,

and are familiar with the mining process. You

also state that you are familiar with the nature

and usage of mining these cryptocurrencies.  You

acknowledge that the responsibility for

maintaining your own software and hardware, in

order to access and make use of the services, is

yours, and yours alone; do you understand that?

A.  Yes.

Q.  Do you agree with this statement?

A.  I don't agree or disagree, it's --

it's what's on the sheet.  I don't know the

meaning.

Q.  And again, this is your first time

reading this, today; correct?

A.  Yes.

Q.  Okay.  And if you look at the

second paragraph, it says:  We do not

guarantee -- warrant or guarantee that the

services will be profitable at any time.  You

agree and accept that you cannot make any claim

against us for any amount of coins under the

terms of this agreement and we do not warrant or

guarantee value of any output, whatsoever.

Additionally, you acknowledge that the value of

any coins mined is dependent on the actual price

when compared to any given cryptocurrency or

fiat.  This is a concept of, quote, unquote,

market price volatility and is termed as such;

do you see that?

A.  Yes.

Q.  And again, this is your first time

reading this; correct?

A.  Yes.

Q.  And if you look at the last

paragraph, it says:  The content of our website

is provided on the basis of generate -- general

informational use.  The content does not

constitute advice, whether formal or informal.

We undertake to make reasonable effort to ensure

all information listed on our website is up to

date and relevant, but do not make any

guarantee, warranty or representation, implied

or expressly, that the contents of the website

is up-to-date or complete at any time; do you

see that?

A.  Yes.

Q.  And again, that's -- this is your

first time seeing and reading this document?

A.  Yes.

Q.  Or that portion of it; correct?

A.  Yes.